974 P.2d 1067

**In the Interest of John DOE, Born on September 14, 1996**

No. 21354

Intermediate Court of Appeals of Hawai'i.

Feb. 25, 1999.

Certiorari Denied March 17, 1999.

**478**

Patrick A. Pascual, Mary Ann Magnier, & Jay K. Goss, Deputy Attorneys General, on the brief for Department of Human Services-appellee.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

This in an appeal from a December 4, 1997 order of the family court of the first circuit (the court) revoking the existing service plan, dissolving the parental rights of Mother–Appellant (Mother) in John Doe (Child),[1] awarding permanent custody of Child to Department of Human Services–Appellee (DHS or the DHS) and establishing a permanent plan for the adoption of Child, and the court's February 5, 1998 findings of fact (findings) and conclusions of law (conclusions).

We hold that there was clear and convincing evidence supporting the court's findings and conclusions, pursuant to Hawai'i Revised Statutes (HRS) § 587–73(a)(2) (1993), that at the time of trial it was not reasonably foreseeable that Mother would be able to provide Child with a safe family home[2] within a reasonable period of time not exceeding three years from the date of court ordered foster custody.

---

1. The legal father of John Doe (Child) did not join in this appeal.

2. The term "safe family home" is not defined in Hawai'i Revised Statutes (HRS) § 587–2 (1993).

"Family home," however, is defined as "the home of the child's legal custodian where there is the provision of care for the child's physical and psychological health and welfare." HRS § 587–2.

HRS § 587–25 (1993), entitled "Safe family home guidelines[,]" sets forth the criteria the court must consider "when determining whether the child's family is willing and able to provide the child with a safe family home[.]" HRS § 587–25(a). Examples of these criteria include "current facts relating to the child[,]" i.e., "[a]ge and vulnerability[,]" "[c]urrent living situation[,]" "history of substance abuse by the child's family ... [,]" and "the child's family['s] ... demonstrat[ion of] an understanding and utilization of the recommended/court ordered services designated to effectuate a safe home for the child[.]" *Id.*

We believe, as contended by Mother, that the court erred in adopting the January 24, 1997 second service plan because there is no evidence Mother signed the plan or received a copy thereof as required by HRS § 587–26(e) (1993). However, under the circumstances here, such error did not affect the court's ultimate December 4, 1997 order.

As to Mother's other points on appeal, we further hold that HRS § 587–72(c)(3) (1993) does not establish one year or eighteen months as the "minimum reasonable time frame" for DHS to expend in attempting to reunify a child placed in foster care with that child's parent. Further, we believe that unless expressly mandated in HRS § 587–72(c)(3), the family court need not convene a show cause hearing for the purpose of permitting a parent to present evidence on the question of whether a future hearing to determine termination of parental rights should be or should not be held. Lastly, we conclude that HRS § 587–73(a)(2) does not require DHS to attempt reunification of a child with its parent for a three-year period before DHS may request permanent custody of a child who has been placed in foster custody. Thus, we affirm the aforesaid order and findings and conclusions.

## I.

### A.

Child was born on September 14, 1996. DHS took custody of Child on September 26, 1996, alleging that he was exposed to "imminent harm."[3] DHS also filed a family court petition on September 26, requesting that Child be placed in temporary foster custody with an "appropriate authorized agency."

In its petition DHS represented that "[C]hild was born weighing 5 pounds and [would] remain hospitalized for some 2 weeks because of 'hemorrhaging' in his lungs[,]" Mother had an "18[-] year history of illegal use of drugs, especially heroin[,]" and permanent custody of Child's two siblings had been previously awarded to DHS in August 1995.

Based on the petition, a temporary custody hearing was held on September 30, 1996. According to a September 30, 1996 written order form, Mother, the guardian ad litem for Child (the guardian), a DHS representative, and the deputy attorney general representing DHS (the DHS attorney) were present at the hearing.[4]

In the order the court found, in pertinent part, that "[t]here [was] reasonable cause to believe that continued placement in emergency foster care [was] necessary to protect [Child] from imminent harm[,]" and a written service plan[5] dated September 26, 1996 (the first service plan) "[had] been explained to and [was] understood by each party at the hearing[.]" The court directed that DHS be awarded temporary foster custody of Child pursuant to HRS § 587–53(f) (1993),[6] the first service plan be "made part of [the September 30, 1996] order[,]" and the parties return to a hearing on October 17, 1996.

The first service plan, attached as "Exhibit A" to the September 30, 1996 order, stated, in relevant part, that the plan was "between [Mother] ... and [DHS,]" the "focus" of the

---

3. HRS § 587–2 defines "imminent harm" as "reasonable cause to believe that harm to the child will occur or reoccur within the next ninety days with due consideration being given to the age of the child and to the safe family home guidelines, as set forth in section 587–25."

4. No transcript of the September 30, 1996 hearing is made a part of the record on appeal. Thus, we rely on the written form order of the family court of the first circuit (the court) in determining who was present and what occurred at the hearing.

5. HRS § 587–2 states that a " '[s]ervice plan' means a specific written plan prepared pursuant to section 587–26." Pertinent to this case, HRS § 587–26(b)(1) (1993) provides that a "service plan should set forth ... [t]he steps that will be

necessary to facilitate the return of the child to a safe family home...."

6. HRS § 587–53(f) (1993) states, in relevant part:

After a temporary foster custody hearing, if the court determines that there is reasonable cause to believe that continued placement in foster care is necessary to protect the child from imminent harm, it *shall order that the child continue in the temporary foster custody of the [Department of Human Services] under the terms and conditions, including, but not limited to, orders concerning services and assistance ... as are deemed by the court to be in the best interests of the child[.]*

(Emphasis added.)

plan was "[Mother's] ... extensive history of heroin use as well as a mental health concern[,]" and that the goal was to "[r]eturn [C]hild [to the] home (Reunification)."[7] Under a section entitled "Things to be Done," the plan imposed certain obligations on Mother.[8] Under "Outcomes," the plan advised Mother that her parental rights might be terminated by an award of permanent custody to another party unless she was willing and able to provide Child with a safe family home within a reasonable period of time specified in the service plan.

At the end of the document, the section of the plan entitled "Signatures," read, "This plan has been reviewed with me." This section was apparently signed by Mother, with the date "9–30–96[,]" and by a social worker, with the date "9–26–96." Below their signatures and the sentence, "I have reviewed this document[,]" was the signature of a "[s]upervisor [r]epresenting the [DHS]," with the date "9–26–96."

7. With respect to "reunification," HRS § 587–1 (1993) states, in relevant part, that "[t]he policy and purpose of this chapter is to provide children with prompt and ample protection from the harms detailed herein, [and] with an opportunity for timely reconciliation with their families where practicable[.]"

 The legislature recently restated the purpose of HRS chapter 587 as "mak[ing] paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm, and provide for treatment and permanent plans for these children and their families...." 1998 Haw. Sess. L. Act 134, § 6, at 506.

8. Specifically, the September 26, 1996 service plan required Mother to

 participate and complete "PFF" services until [Mother is] admitted into a residential drug program[,] ... submit to random drug tests as determined by [Appellee–Department of Human Services (DHS or the DHS),] ... participate and complete parenting classes as arranged by DHS[,] ... participate and complete a psychological evaluation scheduled by [the Child Protective Services (CPS)] Team psychologists and its recommended treatment as arranged by the [DHS], ... keep DHS informed of [Mother's] most current address and telephone number[, and] ... participate in supervised visits with [Child] as arranged by the DHS social worker.

9. The role of Community Care Services (CCS) is not identified in the record.

## B.

On October 17, 1996, the previously scheduled hearing was attended by Mother, two DHS representatives, a representative from Community Care Services (CCS),[9] and the DHS attorney.[10] Mother was not represented by counsel. According to the October 17, 1996 written form order of the court, Mother was tardy to the hearing, default was entered against her; but default was set aside upon her arrival. As part of this order, the court found that "continued placement [of Child] in emergency foster care was necessary," and "[b]ased upon the [DHS] report submitted pursuant to HRS § 587–40 [(1993)][11] and the record ... there [was] an adequate basis to sustain the petition[.]" The order further advised that parental rights might be terminated if the family was unable to provide a safe family home "even with the assistance of a service plan."

The court "awarded foster custody over [Child]" to DHS, ordered all parties "to ap-

10. No transcript is provided for the October 17, 1996 hearing. Thus, we discern the persons present and the events that occurred, from the October 17, 1996 written order of the court.

11. HRS § 587–40 (1993) provides, in pertinent part:

 **Reports to be submitted by the [DHS] and authorized agencies; social worker expertise.** (a) The [DHS] or other appropriate authorized agency shall make every reasonable attempt to submit written reports ... to the court with copies to the parties or their counsel or guardian ad litem[.]

 . . . .

 (b) Report or reports pursuant to subsection (a) specifically shall:
 (1) *Assess fully all relevant prior and current information concerning each of the safe family home guidelines, as set forth in section 587–25* ...; [*See supra* note 2]
 (2) In each proceeding, subsequent to adjudication, recommend as to whether the court should order:
 (A) A service plan as set forth in section 587–26 or revision or revisions to the existing service plan, ... or
 (B) A permanent plan or revision to an existing permanent plan and if it is an initial recommendation, ... and
 (3) Set forth recommendations as to such other orders as are deemed to be appropriate and state the basis for recommending that the orders be entered.
 (Emphasis added.)

pear at a review hearing on January 28, 1997," required DHS to submit a "report and plan ... prior to [January 28,]" and the guardian to submit his "recommendation/ objection statement." Additionally, the court required that Mother "enroll in [the Salvation Army's] Women's Way [program] before [the] next hearing and as a condition prior to having [Child] returned to her."

### C.

According to the written order form of the court dated January 28, 1997, the parties present at the review hearing consisted of a DHS representative, a CCS representative, the guardian, and the DHS attorney. Mother did not appear at the January 28, 1997 hearing, and no counsel appeared on her behalf.[12]

Nevertheless, the court ordered that "foster care [be] continued[,]" a "service plan dated January 24, 1997 [ (the second service plan) ]" be made a part of the order, all parties appear at a "review" hearing on July 15, 1997, and all "prior consistent orders, [were to] remain in full force and effect[.]" Further, the order reflected that Mother had "defaulted" and a bench warrant[13] had been issued for her arrest for "failure to appear."

The second service plan, attached as Exhibit A to the January 28, 1997 order, indicated it was to "be in effect for six months or until further order of the court." Because

Mother was not present at the hearing, the section of the second service plan that read, "This plan has been reviewed by me," was not signed by Mother, and the line provided for her signature is blank. However, a DHS social worker signed and dated the document "1/27/97" below the signature line provided for Mother, and again, a "[s]upervisor [r]epresenting [DHS]" signed with a date of "1/27/97" below the sentence, "I have reviewed this document."

The "goal" of this plan was to "reunite" Child with Mother by "September 1997," with a "target date" of terminating DHS services in "March 1998." The second service plan again set forth certain obligations required of Mother.[14]

Subsequently, a June 30, 1997 safe family home guidelines report[15] prepared by DHS indicated that "[t]he reason [Mother] missed the 01/28/97 court hearing was that [Mother] had been arrested for [an offense]. [Mother] has been incarcerated at the [O'ahu] Community Correctional Center (O.C.C.C.) on a '... charge.' "

On March 5, 1997, Mother was appointed counsel through an "Order Appointing Counsel."

### II.

On July 11, 1997, DHS filed a motion for an order revoking the existing service plan,

---

**12.** No transcript of the January 28, 1997 hearing is made a part of the record on appeal. Thus, we look to the written form order dated January 28, 1997, to determine who was present and what took place at the hearing.

**13.** The bench warrant was subsequently cancelled.

**14.** The January 24, 1997 service plan required Mother to do the following:

[C]all and schedule an in-person appointment with the DHS social worker within one week of this court hearing to discuss [Mother's] current situation and plans[,] ... call and speak with the DHS social worker at a minimum of once per week[,] ... attend and fully participate in the Drug Addiction Services of [Hawai'i] (DASH) program[,] ... participate in any and all required group classes or individual sessions[,] ... [s]ubmit to random drug testing, as requested by DHS and/or service providers[,] ... cooperate with [Mother's CCS]

case manager and attend and fully participate in any and all services or programs that may be recommended[,] ... attend and fully participate in individual counseling sessions[,] ... cooperate with the Catholic Charities Hale Malama program[,] ... [and c]ooperate with the DHS and the [guardian ad litem for Child (the guardian) ] by: [a]llow[ing] the sharing of information, both written and verbal, between the DHS social worker, [the guardian,] and all agencies and professionals assisting the family[, a]llow[ing] the DHS social worker to visit the family home with or without advance notice, and allow[ing] the DHS to interview any person residing in the home[, n]otify[ing] the DHS within 48 hours of any significant changes in [Mother's] situation, i.e., residence, telephone number, employment, etc. . . .

**15.** A safe family home guidelines report provides the court with an assessment of a family's progress with respect to the guidelines set forth in HRS § 587–25. *See supra* note 2.

awarding permanent custody of Child to an authorized agency, and establishing a permanent plan which would "propose adoption or permanent custody [of Child]" (permanent plan motion).[16]

In support of its motion, DHS submitted into evidence a proposed permanent plan dated June 30, 1997, which proposed adoption of Child, and two safe family home guidelines reports dated June 30, 1997 and July 9, 1997. Both reports are the same, except for the conclusion in the June 30, 1997 report referred to *infra*. The two reports state, in material part, as follows:

[Mother] called and spoke with the DHS social worker on 02/26/97. Later that day [Mother] arrived at the DHS office to speak with the DHS social worker. [Mother] reported that she had been arrested for [an offense], she was on three different types of medication and that she gave someone else's urine for a UA [ (urine analysis) ] at Drug Addiction Services of [Hawai'i] (DASH). . . .

. . . .

From 03/03/97—03/05/97, [Mother] was hospitalized at Queen's Hospital. [Mother] stated that she walked into a pole. [The CCS worker] informed the DHS that [Mother] overdosed on substances. . . .

After the methadone detox, [Mother] went to Castle Hospital to complete her detoxification. [Mother] was at Castle Hospital from 03/14/97—03/23/97. She then disappeared.

. . . .

Mother has had a long-standing, severe problem with substance abuse that has led to the removal of her two other children and subsequent termination of parental rights.

Mother's participation in services has been minimal at best. She has not utilized the services and classes offered to her especially through DASH and [CCS]. . . .

Even before [Mother] was incarcerated[,] her ability to maintain consistent contact with [Child] through visitations and attendance at medical appointments was sporadic. . . .

[Mother] stated that prison has been good for her and she is now sober and wants a second chance with [Child]. The DHS, however, believes that [M]other has been given ample time to show that she can provide a safe nurturing home environment for [Child] and understand his medical problems. There are too many questions concerning [Mother]'s availability and ability to parent her child—length of incarceration, type of sentence she may receive, commitment to this child, maintaining sobriety[,] and being able to understand [C]hild's severe medical needs. The DHS also questions [Mother]'s commitment as she has not kept in touch with the DHS and unless reminded does not know who the DHS social worker is.

In the June 30, 1997 report, DHS concluded that even with the assistance of a service plan, Mother would be unable to provide a safe family home for Child within a reasonable period of time:

The DHS is convinced that even with the assistance of a service plan, [Mother is] unable to provide a safe and nurturing home environment for [Child]. In addition, the *DHS is convinced that it is not reasonably foreseeable that [Mother], even with the assistance of a service plan, will be able to establish a safe, stable and nurturing home for [Child] within a reasonable period of time.* . . .

(Emphasis added.)

### III.

### A.

On July 15, 1997, a hearing was held on DHS's permanent plan motion. Mother was

---

16. This motion was made pursuant to HRS §§ 587–2, 587–27, and 587–73.

HRS § 587–2 sets forth the definitions of the terms used in chapter 587 (1993).

HRS § 587–27 is entitled "Permanent plan," and specifies the required contents of a permanent plan which results in the termination of the natural parents' parental rights, and placement of the child with a third party.

HRS § 587–73, entitled "Permanent plan hearing," sets forth the court's obligations at such a hearing, and describes the "criteria" which must be demonstrated by "clear and convincing evidence" in order for the court to adopt a permanent plan as delineated in HRS § 587–27.

not present but her court-appointed attorney did appear. Mother's attorney represented that he had not "spoken with [Mother].... [He] went to look for her at [the] cellblock and ... [s]he probably was bailed out." He also reported that the last time he spoke with Mother, "[s]he wanted to continue on, get herself into drug court and pursue reunification."

The court asked if Mother knew of the hearing date. Mother's counsel replied, "I can assume so ... we discussed it while she was in jail ...," and then interjected, "I don't know if she remembers it." The court, however, found that Mother was in default.

In its July 15, 1997 written form order, the court concluded that Mother was "not presently willing and able to provide [Child] with a safe family home, even with the assistance of a service plan[,]" and "[i]t is not reasonably foreseeable" that she would be. As a result, the court revoked the existing service plan, divested Mother's parental rights to Child under HRS §§ 587–2 (1993) and –73,[17] and appointed the Director of the DHS as Child's permanent custodian.

### B.

On August 4, 1997, Mother filed a motion for reconsideration of the July 15, 1997 order. The affidavit of Mother's counsel stated that neither he nor Mother were served with a copy of DHS's permanent plan motion prior to the July 15, 1997 hearing. Further, counsel stated that at the time of the permanent plan hearing, he had erroneously informed the court that Mother had been "bailed out." According to Mother's attorney, Mother remained "in custody" at

O.C.C.C. and was "not transported" to the court due to a "transport mistake." As a result, Mother was unable to "voice her position and concerns regarding the [m]otion."

A hearing on the reconsideration motion was held on October 10, 1997. Mother again was not present. Her attorney stated that she was still in prison, and was absent because of "transportation difficulties." Apparently, the court had requested that Mother be transported to the hearing. Mother's attorney noted, however, that the request "went to [O.C.C.C.], [but Mother was] in women's prison...."

At the hearing, the DHS representative indicated that Mother had been sentenced to a minimum prison term which ran "at least through June [1998.]" At the conclusion of the hearing, the court granted Mother's motion for reconsideration. The court issued a written order granting Mother's reconsideration motion, "set[ting] aside" Mother's "prior default," but stating that except for the July 15, 1997 order, ":no prior orders ... [were] set aside." A new hearing on DHS's permanent plan motion was set for December 4, 1997.

### IV.

At the hearing held on December 4, 1997, Tracy Ober (Ober), a DHS social worker, was stipulated by the parties to be an "expert in the area of social work and child protective and welfare services." Ober testified she relied on an "evidence packet" containing four safe family home guidelines reports,[18] other various reports documenting "information" provided by family members, evalua-

---

17. HRS § 587–73(a)(1) and (2) provide:

(a) At the permanent plan hearing, the court shall consider fully all relevant prior and current information pertaining to the safe family home guidelines, as set forth in section 587–25, including, but not limited to, the report or reports submitted pursuant to section 587–40, and determine *whether there exists clear and convincing evidence* that:

(1) The child's legal mother ... [is] *not presently willing and able to provide the child with a safe family home,* even with the assistance of a service plan;

(2) *It is not reasonably foreseeable* that the child's legal mother ... *will become willing*

and able to provide the child with a safe family home even with the assistance of a service plan, within a reasonable period of time which shall not exceed three years from the date upon which the child was first placed under foster custody by the court.

(Emphases added.)

18. The safe family home guidelines reports included in the "evidence packet" consisted of reports dated September 26, 1996, July 9, 1997, June 30, 1997, and January 24, 1997. Substantial portions of the July 9 and June 30 reports are quoted in the text, *supra*.

tions from psychologists, "discussions" with state agency members, and "observations" by DHS personnel. Ober related that Child was considered a "needy child" because Child's "respiratory problem [was] still a concern[,]" and that he was "still considered a special medical needs child." According to Ober, "[if Child went] into respiratory distress and his caretaker [were] not aware[,] ... [Child] could die." Ober stated that "[w]hen [Mother] first went to women's prison, she was involved in the Transitional Community Program.[19] That lasted approximately a month or a little over a month. . . . [I]t was pretty much a daily occurrence where she asked to leave the program. . . ."

Further, Ober opined that Mother would not be willing and able to provide Child with a safe family home within a reasonable period of time, even with the assistance of a service plan. Ober reported that Mother had been sentenced to a prison term of five years with a minimum term of one year and two months. It was Ober's belief that even if Mother "did get out [of prison] in June of 1998, at that point there would need to be some type of substance treatment. She would need to be able to show that she's clean. There would need to be parenting programs." Explaining that the reunification process would have to be "gradual," Ober maintained that the "whole process" would take "two years plus" from the time Mother was released from prison. Ober urged that such an amount of time was necessary because based on "[Mother]'s history, she's been in and out of ... the prison system[, when] she's gotten out, she's gone back to using substances," and there "would need to [be] a ... track record and a history of being clean" before Child could be returned to her. Ober testified that a "two-and-a-half-year" period "would be time for substance [abuse] treatment ..." and "at least a year's time of [Mother] being substance free." Ober also concluded that "[d]uring that same time frame, [Mother] would still need to be looking at parenting programs, individual counseling, [and] possibly psychiatric therapy, which may need [sic] medication." In Ober's

view, the goal of adoption set forth in the permanent plan was in Child's best interests.

The guardian "agree[d] with the position of Ober, that permanent custody was indicated." The guardian explained that Child was a "vulnerable baby." While the guardian had visited Mother in prison and "wanted to believe ... that [Mother] genuinely wanted to have her son back[,]" the guardian was "shocked to learn that [Mother] had dropped out of the therapeutic community because that seemed to set up a pattern of withdrawal from drug rehabilitation that ... is critical ... if there is going to be reunification."

Mother testified that while in prison, she was enrolled in the Salvation Army's Adult Treatment Services, a program that met four times a week. She explained that she had left the Transitional Community Program because "[she] was under a lot of stress, lot of pressure. It was too degrading. . . ." With respect to her drug addiction, Mother testified, "I've been drug free, okay, in prison. And there is [sic] drugs in the prison." It was established that Mother had been enrolled in the Adult Treatment Services program since November 18, 1997.

At the conclusion of the hearing, the court stated:

[U]nder the law [Mother is] required to prove that [she] can establish a safe home if [she] want[s C]hild now. The reasonable time is fourteen months. I could give [her] six months, but [she]'d still be in prison.

. . . .

Notwithstanding [Mother]'s motivation and love for this child—which I commend—the *[c]ourt's going to find that [Mother] is not presently willing and able to provide [Child] with a safe family home, even with the assistance of a service plan and even within a reasonable period of time.*

. . . .

*Court's going to find the State has proved this by clear and convincing evidence.* It's going to terminate the existing service plan, revoke the foster custody prior award, terminate the parental rights of

19. The record does not set out the Transitional Community Program's objectives.

[Mother], award permanent custody to DHS and order that the permanent plan [for adoption] be implemented.

(Emphases added.)

On December 4, 1997, the court issued a written form order granting DHS's motion (the permanent plan order). The order stated, in pertinent part:

[Mother] ... [is] not presently willing and able to provide [Child] with a safe family home, even with the assistance of a service plan;

It is not reasonably foreseeable that [Mother] ... will become willing and able to provide [Child] with a safe family home, even with the assistance of a service plan, within a reasonable period of time [.]

(Emphases added.)

## V.

On December 24, 1997, Mother filed a motion for reconsideration of the permanent plan order.

On January 16, 1998, a hearing was held on Mother's motion and the court issued a written order that same day, denying Mother's motion.

On February 5, 1998, the court issued findings and conclusions concerning its permanent plan order.[20] In its February 5, 1998 findings, the court stated, in pertinent part:

20. Mother has an extensive history of abusing heroin for at least 19 years and of abusing alcohol. Mother suffers from both drug and alcohol abuse/dependence and numerous other psychiatric/psychological diagnoses, which require concurrent and long term treatment for her substance abuse and her psychiatric/psychological conditions. To date, Mother has not successfully completed a substance abuse treatment program....

. . . .

23. Mother did not comply with the [c]ourt's October 17, 1996 order that she enroll in the Salvation Army Women's Way residential substance abuse treatment program as a condition of reunifying with [Child].

24. On October 26, 1996, Mother started substance abuse treatment with [DASH]. Substance abuse treatment included Methadone treatment to address her heroin addiction, with eventual medical detoxification.

25. From November 5, 1996 to February 20, 1997, Mother participated in individual therapy ... to address her psychological issues and substance abuse.... Mother did not receive a clinical discharge[.]

. . . .

32. Mother has a history [of] starting substance abuse treatment but never completing substance abuse treatment.

. . . .

37. Mother's visits with [Child] prior to her incarceration in April 1997 were sporadic.

38. Mother had failed to complete any of the services she was ordered to attend.

. . . .

41. Mother has not completed psychotherapy to address her psychological condition....

. . . .

44. Even if Mother were paroled in June 1998, ... Child cannot be reunited with Mother at that time. Mother would still have to participate in residential substance abuse treatment and aftercare, psychotherapy, parenting education, and learning to care for a child with ... Child's special medical needs. After completing substance abuse treatment and aftercare, Mother would need to demonstrate a period of stability, i.e. living a drug[-]free lifestyle, and demonstrating the ability to care for and to handle [the] stress[es] of caring for a child with ... Child's special medical needs. Due to Mother's severe substance abuse and psychological condition,

---

20. From the text of her briefs, it appears that Mother is appealing from the findings of fact (findings) and conclusions of law (conclusions) that she was not presently or for the foreseeable future able to provide a safe family home for the child, pursuant to HRS § 587–73(a)(1) and (2). It does not appear that Mother is specifically appealing any of the other written findings and conclusions made by the court on February 5, 1998.

reunification would be a slow[,] gradual process. *Reunification would not take place within three years after ... Child was first placed in foster custody by the [c]ourt.*

45. Even if Mother were not incarcerated, reunification would not take place within three years after ... Child was first placed in foster custody by the [c]ourt, based on the extent of Mother's own problems (substance abuse and severe psychological problems) and ... Child's special medical needs which both dictate a long period for reunification, and Mother's history of being unable to continuously participate in services to effect positive change.

46. Mother is not presently willing and able to provide ... Child with a safe family home, even with the assistance of a service plan because her foregoing problems continue to exist and she has refused, frustrated, and failed to benefit from the services which have been provided to her since the start of this case in September 1996 and previously in the case involving ... Child's two older siblings.

47. *It is not reasonably foreseeable that Mother will become willing and able to provide ... Child with a safe family home, even with the assistance of a service plan* because even if Mother were to suddenly change her long standing pattern of behavior, there is no likelihood that she would sufficiently resolve her problems at any identifiable point in the future.

(Emphases added.)

In its February 5, 1998 conclusions, the court stated, in relevant part:

3. The [c]ourt may look to the past and present conditions of the home and natural parents so as to gain insights into the quality of care [Child] may reasonably be expected to receive in the future. *Woodruff v. Keale*, 64 Haw. 85, 99, 637 P.2d 760, 769 (1981), citing *In re Mary Doe II*, 52

Haw. 448, 453, 478 P.2d 844, 847 (197[0] ). *See* HRS § 587–25(a)(4).

4. [Mother] ... [is] not presently willing and able to provide ... Child with a safe family home, even with the assistance of a service plan.

5. *It is not reasonably foreseeable that [Mother] ... will become willing and able to provide ... Child with a safe family home, even with the assistance of a service plan, within a reasonable period of time.*

6. That the permanent plan dated June 30, 1997 is in the best interests of ... Child.

(Emphasis added.)

### VI.

On appeal, Mother challenges the court's ultimate determination that at the time of trial it was not reasonably foreseeable that she would provide a safe home for Child within a reasonable period of time. Findings 46 and 47 and conclusions 4 and 5 both mirror the criteria of HRS §§ 587–73(a)(1) and (2), which, if "established by clear and convincing evidence," will result in termination of an existing service plan, revocation of temporary foster custody, award of permanent custody to "an authorized agency," and the implementation of "an appropriate permanent plan[.]" *See* HRS § 587–73(b).[21]

We review the court's findings under the clearly erroneous standard. *In re Doe*, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996) (citing *State v. Naeole*, 80 Hawai'i 419, 423 n. 6, 910 P.2d 732, 736 n. 6 (1996)). Conclusions 4 and 5 are based on the factual determinations in this case, and a conclusion "that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case." *AIG Hawaii Ins.*

---

21. HRS § 587–73(b) provides, in pertinent part:
 (b) If the court determines that the criteria set forth in subsection (a) are established by clear and convincing evidence, the court shall order:
 (1) That the existing service plan be terminated and that the prior award of foster custody be revoked;
 (2) That permanent custody be awarded to an appropriate authorized agency;
 (3) That an appropriate permanent plan be implemented concerning the child whereby the child will:
 (A) Be adopted pursuant to chapter 587[.]

*Co. v. Estate of Caraang*, 74 Haw. 620, 629, 851 P.2d 321, 326 (1993) (internal quotation marks and citations omitted). Further, in *In re Doe*, 7 Haw.App. 547, 558, 784 P.2d 873, 880 (1989), this court concluded that "the decision as to what custodial arrangements are in the best interests of a child is a matter or question of ultimate fact reviewable under the clearly erroneous standard of review." Thus, "[t]he court is given much leeway in its examination of reports concerning [a child's] care, custody and welfare, and its conclusions, if supported by the record and not clearly erroneous, must stand on appeal." *Woodruff*, 64 Haw. at 99, 637 P.2d at 769.

■ "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *Hirono v. Peabody*, 81 Hawai'i 230, 232, 915 P.2d 704, 706 (1996). In this case, because conclusions are treated as "questions of ultimate fact," such an analysis would apply not only to the court's findings, but also to its conclusions.

Mother raises three points in her apparent assertion that the court erred in finding and concluding that it was not "reasonably foreseeable" that she would become "willing and able to provide Child with a safe family home, even with the assistance of a service plan, within a reasonable period of time." We address these points *seriatim*.

## VII.

### A.

Mother contends that the second service plan was erroneously adopted by the court

22. In her opening brief, Mother cites HRS § 587–26*(d)*; however, she sets forth the text of HRS § 587–26*(e)*. Therefore, we consider her claim as it relates to HRS § 587–26(e).

23. Mother cites "42 U.S.C.A. § 671(16)" in her brief. Presumably, she is citing to 42 U.S.C.A. § 671*(a)* (16) (1994). 42 U.S.C. § 671(a)(16) provides:

(a) In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—

. . . .

since she was not present at the hearing when the plan was ordered. She relies on HRS § 587–26(e) [22] and 42 U.S.C. § 671(a)(16) (1994) [23] in making her argument.

HRS § 587–26(e) states:

*After each term and condition of the service plan has been thoroughly explained to and is understood by each member of the child's family* whom the appropriate authorized agency deems to be necessary to the success of the service plan, *the service plan shall be agreed to and signed by each family member. Thereafter, a copy of the service plan shall be provided to each family member who signed the service plan.*

(Emphases added.)

According to Mother, both "[Hawai'i] and federal statutory provisions require[d] explanation of each term and condition of [the second] service plan, agreement . . . to said terms, and [her] signature as vital components of the case plan." Because this was not accomplished, Mother argues she "had no participation in the adoption of [the plan and] had no knowledge or understanding of the terms [of the plan]. She further asserts she "was unrepresented [by counsel] at the time" and that counsel was only appointed "after the reconsideration period [for the court's order adopting the second service plan] had lapsed."

DHS maintains that we should not consider this claim because Mother failed to ask that the second service plan be set aside when, through counsel, she first moved the court to reconsider its permanent plan order.

(16) provides for the development of a case plan (as defined in section 675(1)) for each child receiving foster care maintenance payments under the State plan and provides for a case review system. . . .

According to the DHS, 42 U.S.C. § 671(a)(16) is part of the Adoption Assistance and Welfare Act of 1980, as amended by the Adoption and State Family Act of 1997, 42 U.S.C. §§ 620–628 and 670–679a, which provides for a "federal reimbursement program to the State for foster care and adoption costs." Because the Act is not germane to our disposition, we do not discuss it.

We note that on its face, HRS § 587–26(e) directs that "each term and condition of [a] service plan" be "thoroughly explained to and ... understood" by the family member concerned. Additionally, the service plan must be signed by the appropriate family member and a copy given to such family member.

The second service plan dated January 24, 1997 and adopted at the January 28, 1997 hearing, was not explained to Mother at the hearing since she was absent.[24] There is nothing in the record to confirm her understanding of the service plan's terms.[25] The record does not show that Mother was afforded the opportunity to agree to the plan. Obviously, the plan was not signed by Mother. Nothing in the record indicates Mother received a copy of the second service plan.

Further, HRS § 587–71(h) (1993) mandates that "[p]rior to ordering a service plan at the disposition[26] or continued disposition hearing, the court shall make a finding that each term, condition, and consequence of the service plan had been thoroughly explained to and is understood by each party or a party's guardian ad litem." Finding 60 acknowledges that "two service plans [were] offered by DHS and ordered by the [c]ourt ..." but only "one service plan [was] agreed to by Mother ... and understood by Mother." The court made no findings with respect to whether Mother was notified of the

second service plan's implementation at the January 28, 1997 hearing.

While we believe the court erred in adopting the second service plan without complying with the requirements of HRS §§ 587–26 and –71(h), ultimately this error did not affect the court's determination that at the time of trial, it was not reasonably foreseeable that Mother would be able to provide a safe home for Child within a reasonable period of time.

In its findings, the court did not expressly find that Mother had failed to comply with the terms of the second service plan. The only condition which seemingly relates to the second service plan is finding 24, which stated that Mother had "*started* substance abuse treatment with [DASH]" on October 26, 1996. (Emphasis added.) The second service plan called for Mother to "attend and fully participate in the ... [DASH] program." However, the second service plan was ordered on January 28, 1997, approximately three months after October 26, 1996. The reference to DASH, accordingly, would appear to be related to Mother's inability to complete programs, rather than to a violation of the second service plan. Further, the second service plan targeted reunification of Child with Mother by September 1997 and termination of DHS's services by March 1998. Apparently, in September 1997, Mother was imprisoned and would not be released until

24. DHS argues that Mother's "arrest ... and resultant incarceration at the time of the January 28, 1997 hearing" was not a "valid excuse" for her absence from the hearing. However, there is no evidence Mother voluntarily absented herself from the January 28, 1997 proceeding.

25. It is not clear whether Mother was informed of the January 24, 1997 service plan (the second service plan) or if she was, when such notice took place. The safe family home guidelines reports dated June 30, 1997 and July 9, 1997 stated the following with respect to Mother's "compliance":

On 03/14/97 the DHS social worker received a message to call [Mother] at the CCS office. When the message was returned the DHS social worker was informed that [Mother] was outside lying on the floor, apparently "passed out" and that she could not come to the phone. On 06/17/97, the DHS received a letter from [Mother] which stated that she had made mistakes and that she wanted to be given a second

chance. [Mother] then called the DHS social worker on 06/19/97 and 06/20/97 from [O'ahu Community Correctional Center].

....

[A CCS worker] arranged for and assisted [Mother] with service plan compliance....

It is not evident that the CCS worker, in "arrang[ing] for and assist[ing] [Mother] with service plan compliance," specifically aided Mother in complying with the second service plan. However, as explained in the text *supra*, we do not believe the court's December 4, 1997 order ultimately rested on any failure to comply with the second service plan.

26. An adjudication hearing is one "held pursuant to section 587–63." HRS § 587–2. HRS § 587–63 describes procedures to be followed "if [the family court] finds "facts sufficient to sustain the petition." Since the petition for temporary custody had apparently been granted under the October 17, 1996 order, the second service plan would have been one entered in conjunction with a disposition hearing." See HRS § 587–71(f).

June 1998; thus, the second service plan, by its terms, could not be satisfied.

In the context of the findings, we view the reference to DASH and to the other programs as examples supporting the finding that "Mother's history [is one] of being unable to continuously participate in services to effect positive change." Moreover, it is evident from the findings and conclusions that the court's ultimate conclusion that Mother could not provide a safe home within a reasonable period of time even with the assistance of a service plan rested on Mother's past and present personal history, not on the violation of an express term in the second service plan.

### B.

■ DHS was awarded foster custody of Child on October 17, 1996. Thus, under HRS § 587-73(a)(2), the court was required to consider whether it was reasonably foreseeable that Child could be reunited with Mother no later than three years from October 17, 1996, or by October 18, 1999.

The evidence demonstrated that Mother was to remain incarcerated until at least "June 1998." Assuming her prison term was not extended, sixteen months remained within which Mother was to meet the requirements of providing a safe home for Child. Based on the reports in the file and her interviews, Ober rendered an opinion that it would take "two years plus" after Mother's

release from prison to effect a reunification with Child. Assuming it would take two years for Mother to create a safe family home environment for Child, the earliest anticipated date for reunification would be June 2000, approximately eight months beyond the three-year limit. The reports submitted by DHS in evidence and the testimony at the permanent plan hearing amply support the court's finding [27] that "[e]ven if Mother were paroled in June 1998, ... Child cannot be reunified with Mother at that time.... [R]eunification would be a slow[,] gradual process ... [and] would not take place within three years" from October 17, 1996. Accordingly, we cannot say that finding 47 and conclusion 5 were clearly erroneous.[28]

### VIII.

Mother also contends that DHS did not make "reasonable efforts"[29] to reunite her with Child prior to moving for the entry of a permanent plan. She states that nine months was an insufficient time within which to expend efforts to reunite Mother with child.[30] Her argument rests on HRS §§ 587-72(c)(3) and -73(a)(2). We turn to HRS § 587-72(c)(3) first.

### A.

■ Mother urges that HRS § 587-72(c)(3): (1) establishes a one-year or eighteen-month[31] period as the "minimum 'rea-

27. As we have noted, Mother does not contest any specific findings. *See supra* note 20.

28. Because we decide the court properly revoked the second service plan and granted DHS's motion for a permanent plan, we need not reach the question of whether a "periodic review" for the second service plan was required under HRS § 587-72(a) as contended by Mother.

29. Mother does not indicate that the term "reasonable efforts" appears in HRS chapter 587, but points out that in a July 25, 1988 Hawai'i Family Court memorandum, the family court "impleᐧmente[d] the 'reasonable efforts' requirement of the [federal] Adoption Assistance and Child Welfare Act of 1980" by "adopt[ing] and follow[ing] the guidelines in the publication entitled, *Making Reasonable Efforts: Steps for Keeping Families Together*, developed in 1987 by the National Council of Juvenile and Family Court Judges." DHS agrees that HRS § 587-1 provides that "[e]very reasonable opportunity should be pro-

vided to help the child's legal custodian to succeed in remedying the problems which put the child at substantial risk of being harmed in the family home."

30. Finding 58 stated that "DHS had exerted reasonable and active efforts to reunify ... Child with Mother ... offering necessary and appropriate services to address their problems that led to DHS intervention[.]"

31. HRS § 587-72(c)(3) mandates that the court hold a show cause hearing after the child has been "placed under foster custody" and "residing without the family home for a period of *eighteen months* [,]" not two years as Mother states. (Emphasis added.) In 1998, HRS § 587-72(c)(3) was amended to require a court to hold a show cause hearing "if a child has been living without the family home for a period of *twelve months* [.]" HRS § 587-72(c)(3) (Supp. 1998) (emphasis added).

sonable effort' reunification time frame," and (2) requires a show cause hearing prior to the filing of the permanent plan motion.

HRS § 587–72(c)(2) and (3) state, in pertinent part, as follows:

(c) Upon each review hearing the court shall fully consider all relevant prior and current information pertaining to the safe family home guidelines, as set forth in section 587–25, including, but not limited to, the report or reports submitted pursuant to section 587–40, and:

. . . .

(2) Determine whether the child's family is presently willing and able to provide the child with a safe family home with the assistance of a service plan and, if so, the court shall return the child or continue the placement of the child in the child's family home under the family supervision of the appropriate authorized agency;

(3) *If the child's family home is determined, pursuant to subsection (c)(2), not to be safe,* even with the assistance of a service plan, order that the child remain or be placed under the foster custody of the appropriate authorized agency and, *the court may, and if the child had been residing without the family home for a period of eighteen months or there has been a court ordered service plan for a period of one year shall, set the case for a show cause hearing* at which the child's family shall have the burden of presenting evidence to the court regarding such reasons and considerations as the family has to offer as to why the case should not be set for a permanent plan hearing. Upon such show cause hearing as the court deems to be appropriate, the court shall consider the criteria set forth in section 587–73(a)(1), (2), and (4), or section 587–73(e), and:

(A) *Set the case for a permanent plan hearing* and order that the authorized agency submit a report pursuant to section 587–40; *or*

(B) *Proceed pursuant to this section*[.[32]]

(Emphases added.)

### 1.

■ We are required "to give statutory language its plain and obvious meaning." *Woodruff,* 64 Haw. at 90, 637 P.2d at 764 (citations omitted). In our view, HRS § 587–72(c) sets forth the court's obligations during a review hearing. Subsections (1), (2), and (4) of HRS § 587–72(c) require that the court make certain determinations based on the evidence presented at a review hearing.[33] Subsection (5)[34] mandates that the court order revisions to a service plan, if appropriate, and subsection (6) requires the court to "enter" further orders in the best interests of the child, if necessary.[35] In the event the court determines a child's home is not safe under subsection (2), subsection (3) gives the court the option of (a) placing the child in foster custody, or continuing foster custody, or (b) setting a show cause hearing

**32.** If the court does not set the case for a permanent plan hearing, HRS § 587–72(c)(3)(B) instructs it to review compliance with the service plan, to "[o]rder such revisions to the existing service plan . . . as the court . . . determines to be in the best interests of the child," HRS § 587–72(c)(5), "[e]nter such further orders as the court deems to be in the best interests of the child," HRS § 587–72(c)(6), and under HRS § 587–72(d)(2), set the case for a "review hearing within six months."

**33.** HRS § 587–72(c)(1) mandates the court to "[d]etermine whether the child's family is presently willing and able to provide the child with a safe family home without the assistance of a service plan and, if so, the court shall terminate jurisdiction[.]" (Emphasis added.)

HRS § 587–72(c)(2) requires the court to "[d]etermine whether the child's family is presently willing and able to provide the child with a safe family home. . . ."

HRS § 587–72(c)(4) mandates the court to "[d]etermine whether the parties have complied with, performed, and completed each and every term and condition of the service plan which was previously court ordered[.]" (Emphasis added.)

**34.** HRS § 587–72(c)(5) requires the court, in relevant part, to "[o]rder such revisions to the existing service plan . . . as the court . . . determines to be in the best interests of the child[.]" (Emphasis added.)

**35.** HRS § 587–72(c)(6) requires the court to "[e]nter such further orders as the court deems to be in the best interests of the child."

for the parents to object to a proposed permanent plan hearing. As to the latter option, the court *"shall"* order a show cause hearing "if the child has been residing without the family home for a period of eighteen months or there has been a court ordered service plan for a period of one year," HRS § 587–72(c)(3), but in all other circumstances the court "may" order a show cause hearing.

### 2.

### a.

With respect to Mother's first argument, we discern nothing in HRS chapter 587 or in its legislative history which indicates that DHS must engage in attempts at reunification for a period of one year or eighteen months before its efforts may be deemed "reasonable." HRS § 587–72(c)(3) simply removes the court's discretion to require a show cause hearing in the two situations described. In those two situations, the court is mandated to convene a show cause hearing and thus initiate consideration of whether a permanent plan hearing should be set.

### b.

 Mother's second argument contends that "[a] show cause hearing is an important feature to allow the parties to address the particular concerns of the case before imposing the ultimate penalty—parental rights termination," and that "[a] show cause hearing preceeding [sic] the motion to terminate [M]other's right was never set or heard."

We observe that Child was not outside of the home for eighteen months. The service plans were ostensibly in effect for nine months, not one year. Hence, the court was not mandated to order a show cause hearing. With the exception of those two situations, HRS § 587–72(c)(3) states that the court "may" hold a show cause hearing. We adopt the well-established rule that

"where the verbs 'shall' and 'may' are used in the same statute, especially where they are used in close juxtaposition, we infer that the legislature realized the difference in meaning and intended that the verbs used should carry with them their ordinary meanings." Not surprisingly, we have therefore construed the "close proximity of the contrasting verbs 'may' and 'shall' to require a *mandatory* effect for the term 'shall.'" Thus ... the converse would seem to follow, namely, that the close proximity of the contrasting verbs "may" and "shall" requires a *non-mandatory, i.e.,* a discretionary, construction of the term "may."

*Gray v. Administrative Dir. of Court,* 84 Hawai'i 138, 149, 931 P.2d 580, 591 (1997) (brackets omitted) (emphases in original) (quoting *In re Tax Appeal of Fasi,* 63 Haw. 624, 626–27, 634 P.2d 98, 101 (1981) (citations omitted)). Thus, we agree with DHS that "[t]hrough the use of the discretionary language, [that is,] the word 'may,' the court [did] not have to set [a] show cause hearing" prior to the permanent plan hearing. Accordingly, we cannot say the court erred in holding a permanent plan hearing on DHS's motion without first ordering a show cause hearing.[36]

### B.

 Finally, Mother argues that *In re Male Child,* 8 Haw.App. 66, 793 P.2d 669, *cert. denied,* 71 Haw. 668, 833 P.2d 900 (1990), established a three-year period in HRS § 587–73(a)(2) "as the 'reasonable period' for reunification."

HRS § 587–73(a)(2)[37] states:

At the permanent plan hearing, the court shall ... determine whether there is clear and convincing evidence that:

. . . .

(2) It is not reasonably foreseeable that the child's legal mother, legal father, adjudicated, presumed, or concerned

---

**36.** Whatever implication may be inferred from the statute that a show cause hearing must always precede a permanent plan hearing is undermined by the legislature's use of the term "may" and the lack of any legislative history as to whether a show cause hearing is a prerequisite to a permanent plan hearing in every instance.

**37.** Mother cites HRS § 587–73(2). The correct cite is HRS § 587–73*(a)* (2).

natural father as defined under chapter 578 will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, *within a reasonable period of time which shall not exceed three years from the date upon* which the child was first placed under foster custody by the court[.]

(Emphasis added.)

In *In re Male Child*, the words "foreseeable future" in HRS § 571–61(b)(1)(E) (1985) were interpreted.[38] This court held that "the phrase 'foreseeable future' in HRS [§ ] 571–61(b)(1)(E) had a meaning consistent with HRS [§] 587–73(a)(2) and (e). 'Foreseeable future' in HRS [§ ] 571–61(b)(1)(E) means three years from the filing date of the petition for termination of parental rights[.]" *Id.* at 72, 793 P.2d at 672.

In *In re Male Child*, it was concluded that the family court could terminate a parent's rights to a child if, among other factors, it was determined the parent was found "unable to provide [necessary care for the child] now and in the foreseeable future." This court construed foreseeable future to mean three years because "HRS chapter 587 ... involv[ed] essentially the same criteria and material elements as a termination of parental rights under" the section construed.

Again, nothing in HRS § 587–73(a)(2) or its legislative history indicates that DHS must expend three years in attempting to achieve reunification. While a three-year period is common to both HRS §§ 571–61(b)(1)(E) and 587–73(a)(2), in the latter, the three-year period defines the limits of that "reasonable period of time" for which a parent's willingness and ability to provide a safe family home must be forecasted. HRS § 587–73(a)(2), therefore, does not apply to reunification efforts per se, but establishes the period of time which must be taken into

account in predicting when a safe home will become available for the purpose of determining whether parental rights should be terminated.

### IX.

For the foregoing reasons, we affirm the December 4, 1997 order revoking the existing service plan, dissolving Mother's parental rights to Child, awarding permanent custody to the Director of DHS, and entering a permanent plan with the goal of Child's adoption, and the February 5, 1998 findings and conclusions entered thereon.

---

**38.** HRS § 571–61(b)(1)(E) (1985) provides:

**Termination of parental rights; petition**

...

(b) Involuntary termination.

(1) The family courts may terminate the parental rights in respect to any child as to any legal parent:

....

(E) Whose child had been removed from the parent's physical custody pursuant to legally authorized judicial action under section 571–11(9), and *who is found to be unable to provide now and in the foreseeable future* the care necessary for the well-being of the child[.]

(Emphasis added.)