**STATE OF HAWAII**, Plaintiff–Appellee, v. **STEPHEN RAY RINEHART**, Defendant–Appellant

NO. 14620

(FC–CR. NO. 88–0357(1))

SEPTEMBER 6, 1991

BURNS, C.J., HEEN, J., AND CIRCUIT JUDGE CRANDALL ASSIGNED BY REASON OF VACANCY

## OPINION OF THE COURT BY HEEN, J.

We affirm Defendant–Appellant Stephen Ray Rinehart's (Defendant) jury trial conviction on two counts of Sexual Assault in the First Degree, Hawaii Revised Statutes (HRS) § 707–730(1)(b) (Supp. 1990),[1] and one count of Sexual Assault

---

[1] Hawaii Revised Statutes (HRS) § 707–730(1)(b) (Supp. 1990) reads as follows:

in the Third Degree. HRS § 707–732(1)(b) (Supp. 1990).[2]

## I.

Defendant was charged with sexually assaulting his daughter (the child) when they lived on the island of Maui between January 1987 and March 1988. At that time the child was less than four years old. Defendant had brought the child to Hawaii in July 1986 from California without the knowledge or consent of the child's mother (Mother), his then wife, whom he left at the same time.[3] At that time, the child was approximately two years old. In Hawaii, Defendant and the child first lived on the island of Hawaii but later moved to Maui.

The police finally located the child in Defendant's van in the Maalaea area of Maui on March 2, 1988, and Defendant was arrested.[4] On March 5, 1988, Mother recovered the child from the

---

**Sexual assault in the first degree.** (1) A person commits the offense of sexual assault in the first degree if:

> (b) The person knowingly subjects to sexual penetration another person who is less than fourteen years old; provided this paragraph shall not be construed to prohibit practitioners licensed under chapter 453, 455, or 460, from performing any act within their respective practices.

[2] HRS § 707–732(1)(b) (Supp. 1990) reads as follows:

**Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:

> (b) The person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person[.]

[3] Although there is some dispute in the record over Mother's claim that she had sole legal custody of the child in July 1986, that question is not relevant to the issues in this case.

[4] We do not know the charge upon which Defendant was arrested.

Maui authorities and took her to Sequim, Washington, where Mother lived.

On March 8, 1988, Dr. Madeline Harrington (Dr. Harrington), a pediatrician, examined the child and reported that the child's physical condition was "within normal limits." Dr. Harrington reported no vaginal bruises or tears and that the child's hymen was intact. In a subsequent examination the child tested negative for exposure to gonorrhea, chlamydia, and the HIV virus.

During the first three to four weeks after the child was returned to Mother, Mother noticed numerous instances of unusual behavior by the child. One day the child told Mother something[5] that caused Mother to take the child to the Child Protective Services in Port Angeles, Washington, for consultation. A few days later, Maureen Wollard (Wollard), a supervisor for the Department of Social Services and Housing in Port Angeles, went to the child's home and interviewed Mother and the child. Wollard's interview with the child lasted approximately 30 to 45 minutes. Defendant was indicted on December 16, 1988.[6]

On July 17, 1989, the child was examined again by one Dr. Mary Gibbons (Dr. Gibbons). Using a colposcope,[7] Dr. Gibbons examined the child's genitals and anus. At trial, Dr. Gibbons testified that the examination "was supportive or consistent with sexual assault or vaginal trauma." Dr. Gibbons testified that the child's hymen indicated a healing process had taken place after some

---

[5] What the child told Mother does not appear in the record.

[6] Defendant was originally indicted on seven counts. Counts I, III and V were for Sexual Assault in the First Degree. HRS § 707-730(1)(b) (Supp. 1990). Counts II, IV and VI were for Incest. HRS § 707-741(1) (Supp. 1990). Count VII was for Sexual Assault in the Third Degree. HRS § 707-732(1)(b) (Supp. 1990). Counts II, IV and VI were dismissed on the State's motion prior to trial. Count I was dismissed prior to trial on Defendant's motion.

[7] An instrument designed to facilitate visual inspection of the vagina. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 450 (1981).

trauma. However, Dr. Gibbons did not specify what kind of trauma had occurred. Some of the tissue in the child's vaginal area showed abnormal redness, some of the blood vessels looked abnormal, and there was some vaginal discharge. Dr. Gibbons testified that the vaginal discharge was unusual. Defendant does not challenge Dr. Gibbons' testimony.

Mother testified that the first time she bathed the child after the child was returned to her, she noticed "a large red rash down around her private parts, up front." When she returned to Washington, she took the child to be examined by Dr. Harrington. Over the ensuing 3 or 4 weeks, Mother noticed that the child was "very flirtatious" with adult male relatives. Also, the child wanted to take as many as five tub baths a day. Mother testified that during those baths the child would position herself with her legs up and spread "so her front area was underneath the spigot where the water would come down. She would lift herself up and she tried to hold on to the tub and spread herself and lift herself up. This was while the water was running." The child would have "terrible nightmares," tossing and turning, moaning, crying, itching, rubbing, and crying out. A few times after she and the child had gone to bed together, Mother awoke to find the child trying to get into bed with Mother's husband. Mother also observed the child masturbating on numerous occasions, often more than three times a day.

The child, then approximately 6 1/2 years old, testified at the trial. She testified that Defendant penetrated her with his penis and finger, had her perform fellatio on him, and had her rub lotion on his penis. She also testified that Defendant ejaculated when he penetrated her with his penis and tried to get her to eat the seminal fluid.[8]

---

[8] In Wollard's testimony, she indicated that the child stated that she had consumed the seminal fluid. *See* Part III. B., *infra.*

## II.

Defendant argues first that the lower court erred in finding Wollard qualified to testify for the State as "an expert in the field of child sexual assault therapy." Our review of the record indicates that Wollard's training and experience are sufficient to support the court's exercise of its discretion in finding Wollard qualified as an expert.[9] *State v. Torres*, 60 Haw. 271, 589 P.2d 83 (1978).

Citing *State v. Kim*, 64 Haw. 598, 645 P.2d 1330 (1982), Defendant also contends that Wollard's testimony was inadmissible because her opinion was not "the product of an explicable and reliable system of analysis[.]" *Id.* at 604, 645 P.2d at 1336. We disagree.

On *voir dire*, Wollard testified as follows:

Q.  In addition to that, would you describe for the Court what types of training you received in these 500 or so hours?

A.  Um, how to investigate complaints of child abuse or neglect, interviewing techniques, behaviors to look for in children who have been abused or neglected, family dynamics, healthy families and disfunctional [sic] families, where child abuse, neglect might be

---

[9] Wollard has a bachelor's degree in applied psychology and a master's degree in counseling psychology. She spent two years as manager of a family planning clinic in Port Angeles, and two years as a "therapist dealing with sexual offenders, non–offending spouses, and victims of sexual assault." From 1984 to the time of trial, she was employed as a "child protective service worker" by the State of Washington, and became a supervisor in 1988. Between 1984 and 1988, she interviewed approximately 500 children regarding child abuse and neglect. One hundred twenty–five of those children were alleged victims of sexual assault. In the eight years before trial, she received approximately 500 hours of training in child abuse and neglect, and periodically during the four years prior to trial provided training in those subjects to law enforcement officers and others. She was qualified as an expert in a child sexual assault case in a Washington federal court and approximately 20 times in Washington state courts.

occurring, risk assessments of children and their family, child protective services special training, that was six weeks of training that the State put on. I attended that. I attended approximately six weeks of child welfare training, which is different training from child protective services, legal intervention. I have to work with the legal system, how to intervene legally on behalf of children. That's some of the training that I have attended.

\*       \*       \*

Q.  The training and experience that you have just testified to, are those in line with what is in your opinion acceptable in the scientific community or the community of [sic] field of sexual abuse?

A.  Yes.

Q.  And in those cases in which you were declared an expert, what sort of opinions were you declared an expert on?

A.  I was asked whether in my investigation and throughout my investigation, as I believe, the child had been sexually assaulted.

Q.  Was that based on characteristics or behaviors of the child?

A.  Both, plus interviewing the child. What the child — how the child describes certain things to me, how the child behaves, the characteristics, also other people — I

Q.  Are there in the field of sexual abuse or assault characteristics consistent with children who have been sexually assaulted that you are aware of?

A.  Yes, there are.

Q. Are those characteristics that you are aware of acceptable or based upon those reasonably or relied upon by experts in this field?

A. Yes, they are.

Wollard's testimony provided a sufficient basis for the lower court to permit her to testify as an expert in this case. Her testimony that her training and experience are acceptable in the field of sexual abuse, and that the characteristics exhibited by a sexually assaulted child are acceptable to and relied upon by experts in the field was uncontradicted in the court below. The testimony creates a reasonable inference that Wollard's opinions were based upon an explicable and reliable system of analysis.

On appeal, Defendant has merely argued that the showing was inadequate. His argument is not sufficient to convince us that the lower court abused its broad discretion in admitting Wollard's testimony.

### III.

Relying on *State v. Batangan*, 71 Haw. 552, 799 P.2d 48 (1990), Defendant argues that Wollard's testimony, set forth below, was unduly prejudicial, contending that Wollard's testimony had the effect of bolstering the child's credibility. When this case was decided, however, the rule regarding expert testimony in child abuse cases had been stated in *State v. Kim*, 64 Haw. 598, 645 P.2d 1330 (1982). In *Kim*, the supreme court held that the trial court properly admitted the expert witness' testimony that in his opinion the complaining witness' rape allegations were true. *Batangan*, which was decided after the judgment was entered in this case, established more limited parameters governing expert testimony in child abuse cases than *Kim* did. In essence, Defendant seeks to have us apply *Batangan* retroactively. It is not necessary for us to decide whether *Batangan* should be applied

retroactively, because *Batangan* is clearly distinguishable from the case at hand.

*Batangan* is a "classic" example of a case where the child recanted her accusations of abuse prior to trial but repeated them at trial. The expert in *Batangan* "implicitly testified that Complainant was believable and that she had been abused by Defendant." 71 Haw. at 555, 799 P.2d at 50. The supreme court held that the expert's testimony improperly invaded the province of the jury. *State v. Moran*, 151 Ariz. 378, 728 P.2d 248 (1986), cited with approval in *Batangan*, held the same way in a similar case. The thrust of *Batangan* is that the expert testimony went too far in expressing an opinion that the complainant's testimony at trial was truthful. That is not the situation here.

In this case, Wollard testified that:

A. [s]ometimes children who have been sexually assaulted display certain characteristics. One would be sexualized behavior. They know more about sexual body parts and sexual functions than they should. Sometimes children have night terrors, sometimes they have bedwetting, sometimes they have regressed behavior, younger than what their age appropriate, sometimes they have behavior that's far advanced for their age, they might be doing poorly in school. If they're school aged children they might be involved in drugs and alcohol, sexually promiscuous, flirtatious, they might act out sexually with other children, attempt to become sexual with other adults.

In light of the discussion in Part II, *supra*, the court did not abuse its discretion in allowing that testimony by Wollard. In her ensuing testimony, some of which was objected to by Defendant, as discussed below, Wollard related the child's actions and language to the above characteristics.

## A.

Defendant argues that the following testimony by Wollard on direct examination was inadmissible:

Q. Now in particular, when you interviewed [child], without telling us what [child] told you in total, did [child] display any characteristics to you consistent with the child of that age who has been sexually assaulted?

A. Yes, she did.

Q. Can you describe some of what those characteristics were that you found?

A. I found her sexual knowledge to be more than what I would consider appropriate for a four–year–old that has not been sexually abused. . . .

Q. In particular, was she able to describe to you a male penis?

A. Yes, she was.

Q. And with what particularity or detail?

A. She was able to tell the difference between a erect penis, a hard penis or soft penis, she was able to describe what I would call intercourse. She had a word for that. She was able to talk about the penis squirting and something coming out of the penis.

Q. Those types of responses, were any of those characteristics with the child consistent with a child who had been sexually assaulted?

A. Yes.

Q. Were you also given information with regards to behavior that you had not personally seen?

A. Yes.

Q. Regarding [child], what was some of that behavior?

A. Some of that was acting out sexually with other children, attempting to act sexual and flirtatious with other adults.

Q. Is that consistent with the child who's been sexually assaulted?

A. Yes, it could be.

Q. What other behaviors?

A. Night terrors, wanting to sleep with her mother then wanting to sleep with her stepfather could be part of that, excessive masturbation, doing things to make her — stimulate her own genitals.

Q. Is that characteristic of a child who has been sexually assaulted?

A. Yes.

Q. Was it brought to your attention? Could you comment on for example water being used as a — water being run on her vagina? Would that be appropriate for a child four years old?

A. I don't believe it would be appropriate for a child that age.

Q. Would that be in your opinion consistent to the characteristics of a child who had been sexually assaulted?

A. Yes.

Q. Now a child, in terms of reporting an incident that would occur to a child, would it be characteristic for a child not to report it immediately?

A. That could be.

Q. For example, three to four weeks, say — strike that. What would be a time period that would be consistent with a child reporting child sexual assault?

A. That would have to depend on the child and the circumstance in that child's life. Children need to feel

> safe. When they report, they need to have a safe environment to do that in. They need to feel that somebody will believe that if they report that and that somebody will protect that from happening again.

The child's knowledge of sexual terms and activities was far beyond her years. Her masturbation and running of water over her genitals represented extremely bizarre behavior in a child of such tender years. The origins of such language and actions may well have been beyond the jurors' ken. Wollard merely stated that the words the child used, her knowledge of sexual activities, and her description of the states of the male sex organ were consistent with the characteristics of a child who had been sexually assaulted. Wollard's testimony did not comment directly on the child's credibility. The record shows that in ruling on the admissibility of Wollard's testimony, the trial judge was careful to advise the State that he would not allow Wollard to give her opinion as to the child's credibility, although as we have noted, *Kim* would have allowed such an opinion.[10]

Wollard's testimony unquestionably "embrace[d] an ultimate issue to be decided by the trier of fact[,]" Rule 704, HAWAII RULES OF EVIDENCE (HRE) (1981),[11] i.e., was the child sexually abused. However, that does not render it inadmissible. *Id.* On the basis of the record in this case, and the evidence outlined above, it is our view that Wollard's opinion testimony was of assistance to the jury in understanding the origin of the child's actions and words, Rule

---

[10] The trial judge stated:

I will not permit any opinions which invade the province of the jury, that is, whether [the child] is or is not telling the truth. That's up to the jury to decide.

[11] Rule 704, Hawaii Rules of Evidence (HRE) (1981) provides:

**Opinion on ultimate issue.** Testimony [of an expert] in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

702, HRE (1981),[12] and was not unduly prejudicial to Defendant. Consequently, the trial court did not err in admitting Wollard's testimony.

### B.

Defendant also argues that the following re–direct testimony by Wollard was inadmissible:

Q. Could she have learned — let me ask it this way. In your opinion, could she have learned the acts that she described to you?

A. It's my opinion she had to learn that that was done to her. She could not have been told about it.

Q. When I say acts, in particular the difference between an erect penis and flaccid penis; for example, you call that act knowing the difference between them, or are they simply words?

A. She's describing a behavior as something she observed. That's how I termed that.

Q. An observation?

A. An observation.

Q. This is different, I gather, from something that's been told to her. Is that what you are distinguishing?

A. Yes.

Q. And the texture or taste of semen, is that something that you would characterize as a behavior or

---

[12] Rule 702, HRE (1981) provides:

**Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

observation she has made as opposed to something you told to her?

A. That was something she would have to experience in order to get a descriptive that she did.

Q. Again, the type of words she used in your opinion, were those words told to her or her own words?

A. I believe it was a combination of both. That's my opinion.[13]

(Footnote added).

The State elicited the above testimony on re–direct in response to Defendant's cross–examination of Wollard in which Defendant attempted to show that the child had not experienced the acts she had described, and had not experienced the state of the male organ, but that these things had been described or told to her.[14] Defendant argues that the testimony "is as close to a direct statement that the complainant was telling the truth as it is possible to get."

---

[13] The Opening Brief's quotation of Wollard's re–direct testimony is wrong. The correct testimony is as we've quoted it above.

[14] The pertinent cross–examination of Wollard is as follows:

Q. [by defense counsel] You said when you talked to [child], she used words beyond her knowledge, right?

A. Correct.

Q. Those words were learned?

A. That's correct.

Q. They can be heard by the child?

A. Yes.

Q. They can be told to the child?

A. Correct.

Q. And you don't know who she learned it from?

A. That's correct.

Q. You don't know who may have told her that?

A. That's correct.

Q. You don't know who she may have overheard those words from?

A. That's correct.

Wollard's testimony was admissible to rebut an unfavorable inference from the cross–examination that the child had learned about the acts and things she described by having them described to her and had not really experienced them herself. *Abeyta v. People*, 156 Colo. 440, 400 P.2d 431 (1965); *see also Sturgeon v. Celotex Corp.*, 52 Wash. App. 609, 762 P.2d 1156 (1988) (when a subject is opened up by a party on direct or cross–examination, the other party may cross–examine or examine on re–direct within the scope of the examination in which the subject matter was first introduced).

## IV.

Defendant contends that the trial court erred in denying his motion for a mistrial. We disagree.

Prior to trial, Defendant filed a motion *in limine* to have the trial court prohibit the State's witnesses from using the words "abduct" or "kidnap" to describe how Defendant obtained the child from her mother. The motion was granted. However, one witness, Patty Baronti (Baronti), testified that Defendant's first wife, who was not the child's mother, told Baronti that the child had been "abducted" by Defendant. Defendant's motion for mistrial was denied. Although the court offered to give the jury a cautionary instruction, Defendant refused the offer, not wanting to emphasize the point.

The denial of a motion for mistrial is within the discretion of the court. *State v. Iaukea*, 56 Haw. 343, 537 P.2d 724 (1975). In view of the uncontradicted testimony regarding how Defendant took the child from the unsuspecting Mother, we do not consider the single use of the word "abducted" to have been prejudicial to Defendant. Consequently, we find no error in the denial of Defendant's motion for mistrial.

## V.

Defendant argues that the prosecutor committed prosecutorial misconduct when he elicited testimony that the child was abducted from Mother and attempted to elicit from another witness testimony that someone the child referred to as "the Green Hulk," who apparently had been the child's abuser, was really Defendant. Also, Defendant argues that it was misconduct for the prosecutor to ask Baronti if she had testified truthfully. He contends that the prosecutor's actions called "attention to matters which were clearly impermissible" and constituted a "continuing course" of conduct depriving him of a fair trial. The argument is without merit. The prosecutor's actions, individually and collectively, did not, on the record here, deprive Defendant of a fair trial. *Cf. State v. Pemberton*, 71 Haw. 466, 796 P.2d 80 (1990).

Affirmed.

*Judd R. Scott*, Deputy Public Defender (*Theodore Y. H. Chinn* on the reply brief) for defendant–appellant.

*Victoria Hamilton*, Deputy Prosecuting Attorney, County of Maui (*James B. Takayesu* on the answering brief) for plaintiff–appellee.