981 P.2d 723

**In the Interest of Jane DOE, Born on September 20, 1987**

**and**

**In the Interest of Jane Doe, Born on August 15, 1993**

**No. 96–055K, 96–056K.**

Intermediate Court of Appeals of Hawai'i.

July 13, 1999.

Robert D.S. Kim, on the briefs, for appellant.

Jay K. Goss and Mary Anne Magnier, Deputy Attorneys General, State of Hawai'i, on the briefs, for Department of Human Services.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

We hold in this child protective proceeding brought under Hawai'i Revised Statutes (HRS) chapter 587 that (1) the HRS § 587–31 (1993) requirement that a petition be "verified" is satisfied by a declaration under penalty of perjury that the matters therein are "true and correct," (2) the failure of the children's guardian ad litem to make reports and recommendations required under HRS § 587–34 does not require a remand, (3) the family court possesses inherent power to consolidate cases before it, subject to review for abuse, and (4) whether or not a child is subject to "threatened harm" is a matter of specialized knowledge, upon which experts may testify if their opinions are based upon an explicable and reliable system of analysis. Based on the foregoing, we further hold that the family court of the third circuit (the court) correctly ordered family supervision over Jane Doe I, born on August 15, 1993 (Child I).[1]

Contrary to other contentions of Respondent–Appellant Father (Father), we conclude that threatened harm was properly alleged in the petition filed by Petitioner–Appellee Department of Human Services (DHS or the

---

1. For the purpose of maintaining confidentiality, we use "Child I," "Child II," "Mother," and "Father" in place of the actual names of the parties.

DHS) herein, DHS's disclosure of case information to the police was not a basis for dismissal in the absence of particularized objections to the statutes and rules ostensibly permitting such disclosures, and medical evidence that Child I had not been sexually abused was not exculpatory of an allegation of threatened harm.

Father appeals from the May 13, 1998 amended findings of fact (findings), conclusions of law (conclusions), and order of the court sustaining a HRS chapter 587 petition for family supervision filed by the DHS with respect to Father, Mother, and Child I.

### I.

### A.

According to the DHS's December 20, 1996 "Safe Family Home Guidelines Report"[2] (the home report), on November 18, 1996, Mother reported possible sexual abuse of Child II. The home report states that sometime thereafter, "[Mother] was told [by DHS that Father] would need to leave the family home." Mother then moved into an apartment with her children. The DHS informed Mother "that [Father] was to call the [DHS] to arrange for supervised visits."

2. A safe family home guidelines report provides the court with an assessment of a family's progress with respect to the guidelines set forth in Hawai'i Revised Statutes (HRS) § 587–25 (1993). The guidelines cover "[t]he current facts in relation to the child" including, but not limited to any "reports of harm and/or threatened harm suffered by the child[,]" "[h]istorical facts relating to the alleged perpetrators" and "[w]hether the non-perpetrator[] who resides in the family home has demonstrated the ability to protect the child from further harm and to insure that any current protective orders are enforced[.]" *See In re John Doe,* 89 Hawai'i 477, 478 n. 2, 974 P.2d 1067, 1068, n. 2 (App.1999).

3. "Family supervision" is defined as
 the legal status created pursuant to [HRS § 587–2], section 587–21(b)(2), or by an order of the court after the court has determined that the child is presently in the legal or permanent custody of a family which is willing and able, with the assistance of a service plan, to provide the child with a safe family home. *Family supervision vests in an authorized agency the following duties and rights,* subject to such restriction as the court deems to be in the best interests of the child:

On January 2, 1997, DHS filed separate "Petition[s] for Family Supervision"[3] concerning Child I and Child II, respectively. Child I is Father's natural child. Child II is Father's stepchild and has no biological relationship to him. The petitions were verified by Barbara Reinhart (Reinhart), a DHS social worker who had investigated the children's cases and prepared the home report. In the petition she "declare[d], under penalty of perjury, that the statements made [therein were] true and correct to the best of [her] knowledge, information and belief."

The petitions stated that the children came under the provisions of HRS § 587–11 (1993), which entitles the court to exercise jurisdiction if "the facts and circumstances ... discovered, or ... reported to [the DHS] ... constitute[d] the basis for the finding that the child [wa]s a child whose physical or psychological health or welfare [wa]s subject to imminent harm, ha[d] been harmed, *or [wa]s subject to threatened harm by the acts of omissions of the child's family.*" (Emphasis added.)

In Child II's petition, Reinhart alleged that "[o]n November 12, 1996, [Child II] disclosed ... in a written note to Mother ... sexual harm" committed by Father over a period of

(1) *To monitor and supervise the child and the child's family members who are parties,* including, but not limited to, reasonable access to each of the family members who are parties, and into the child's family home; and
(2) *To have authority to place the child in foster care and thereby automatically assume temporary foster custody* or foster custody of the child. Upon placement, the authorized agency shall immediately notify the court. Upon notification, the court shall set the case for a temporary foster custody hearing within three working days or, if jurisdiction has been established, a disposition or a review hearing within ten working days of the child's placement, unless the court deems a later date to be in the best interests of the child.
HRS § 587–2 (1993) (emphases added).
 HRS § 587–21(b) (1993) provides the "course of action" the Department of Human Service (DHS) may take when investigating a case under HRS chapter 587, including "[r]esolv[ing] the matter in [an] informal fashion," "[s]eek[ing] to enter into a service plan," and "[a]ssum[ing] temporary foster custody of the child[.]"

"about a year[.]" In Child I's petition, Reinhart did not refer to past harm but alleged "[t]hreatened harm" on the ground that "[t]here [was] a reasonable foreseeable substantial risk that harm may occur to [Child I]...."

Further, the petitions "prayed that an inquiry be made into the ... allegations and that ... [f]amily [s]upervision over the [children] be ordered, matters concerning [the children] and other family members be adjudicated, and such other orders as the [c]ourt deems appropriate be entered."

The home report revealed that on November 18, 1996, Child II "participated in a video[-]taped interview at the Children's Advocacy Center (CAC)[;] ... [b]ased on the interview, sexual abuse was confirmed and [Father was] ... identified [as the] perpetrator." Also on November 18, 1996, Child II underwent "a Sexual Assault Nurses Exam (SANE) ... [and t]he preliminary report [was] consistent with [Child II's] allegations." There was no mention of a SANE of Child I.

The home report expressed opposition to reunification with Father "[a]s long as [he] remain[ed] an untreated perpetrator[,] ... [noting that e]ven if [Father] is found not guilty in a criminal case, the [DHS] would still consider him an untreated sex offender." According to the home report, "[u]pon advice from his attorney, [Father] had refused to talk with the [DHS] and [wa]s not willing to participate in services which would assist in the reunification of his family." Consequently, the DHS recommended, *inter alia*, that it "be awarded [f]amily [s]upervision over [the children, Mother, and Father]."

On January 9, 1997, pursuant to HRS § 587–34 (1993),[4] the court appointed a

guardian ad litem (the guardian) for the children.

### B.

At a hearing on February 27, 1997, the DHS agreed to consolidate the cases for "purposes of judicial economy." Father's counsel stated that he had no objections. On March 21, 1997, the court issued a written order consolidating the cases.

On September 24, 1997, Mother and Child II's natural father stipulated to the court's jurisdiction and family supervision of Child II.[5] Father conceded that he had no standing to object to this stipulation since he was not a natural or legal parent of Child II. However, he orally moved to sever the cases, arguing that "consolidation of the cases, which was agreed to earlier on ... now complicate[d] and prejudice[d his] rights[.]" The court orally denied the motion without prejudice.

On September 25, 1997, after the adjudicatory hearing commenced, Father renewed his oral motion for severance. The court denied the motion to sever, ruling that because the children were born of the same Mother and lived in the same household, consolidation was appropriate.

### C.

On September 24, 1997, DHS called Reinhart as its first witness. She was qualified by the court as "an expert in the area of social work and child protective or child welfare services, pursuant to HRS § 587–40(d) (1993)."[6] She recounted that Child II had revealed Father had "an unsupervised visit" with Child I on "Thanksgiving of '96." This "alarmed" Reinhart because she had an agreement with Mother that the children

---

**4.** HRS § 587–34 (1993) states, in relevant part, that "[t]he court shall appoint a guardian ad litem for the child to serve through the pendency of the child protective proceedings under this [HRS] chapter [587]...."

**5.** Under HRS § 587–62(b)(3) (1993), if a petition has been filed, "[o]n the return date, the court shall preside over a pretrial conference and may order that ... [i]f the parties stipulate to ... family supervision ..., the case be set for a further disposition hearing concerning an appropriate service plan...."

This is contrasted with a situation in which there is no stipulation to family supervision and "the case [is] ... set for an adjudication hearing...." HRS § 587–62(b)(4).

**6.** HRS § 587–40(d) (1993) provides:

(d) A person employed by the [DHS] as a social worker in the area of child protective or child welfare services is qualified to testify as an expert in the area of social work and child protective or child welfare services.

were not to have unsupervised visits with Father once Mother and the children had left the family home.

"Based on the confirmation [7] of . . . sexual abuse [of Child II] . . . [and of Father] being an untreated perpetrator," Reinhart recommended family supervision as a means of reunifying the children with Father. In arriving at her recommendation, Reinhart relied on her in-training sessions, particularly information from "one of the foremost sex abuse offender treatment persons."

On cross-examination, Father's counsel asked Reinhart whether she had "any information, evidence, medical, scientific, first-hand, second-hand, in which [she] found or determined that [Father] in any way sexually [had] molested or abused [Child I]." Reinhart admitted that she had none.

On September 25, 1997, Father's counsel moved to strike Reinhart's testimony, disputing "[her] opinions [as] not conform[ing] . . . to the requirements under . . . Daubert vs. Merrell Dow Pharmaceuticals. . . ." Father's counsel declared that "the witness could not cite any authority that would make the statement she made with regard to risk to [Child I] verifiable by any clinical or empirical research. . . ."

The court ultimately denied the motion.

### D.

The DHS also called Roxy Mico (Mico), a social worker, to testify. Father's counsel objected to Mico's qualification as an expert in sex offender treatment because "she ha[d not] undertaken [any] first[-]hand interviews . . . of the parties" and Father had not been adjudicated a sex offender.

Mico testified to standards of practice established by the Association for the Treatment of Sexual Abusers. She reported that

under the standards, "a person [who] has sexually abused a child . . . should not have access to children until he has undergone treatment and until the safety issues for the children are in place[,] . . . [s]o you need to have trained supervision." Mico referred to "a study . . . done in Vermont where untreated sex offenders recidivated at about [eighty] percent, and [for those] who had gone through the [treatment] program, [there was a recidivism rate of fourteen] percent." Therefore, absent supervision and treatment for Father, Mico "believe[d] that the risk of harm to [Child I was] fairly high."

### E.

Father called Dr. James Bidwell (Bidwell) who was qualified as an expert in pediatrics and child abuse. Bidwell testified that he was contacted by the DHS as a part of its investigation of Child II. Among the materials he reviewed for the DHS were photographs of a culdoscopy [8] procedure, from which he "was not able to conclude one way or another whether there had been sexual abuse or not." Essentially, Bidwell found that "the evidence [did] not allow [him] to conclude that there [was] physical evidence of sexual abuse [of Child II.]"

On cross-examination, Bidwell admitted that "in most sex abuse cases there is no physical evidence of sex abuse[.]"

### F.

At the continued adjudicatory hearing on December 12, 1997, the DHS called Leslie Burke (Burke), another DHS social worker. Despite Father's counsel's objection, the court qualified Burke as an expert witness under HRS § 587–40(d).

7. During the cross-examination of Barbara Reinhart (Reinhart), a DHS social worker, the attorney for Respondent–Appellant Father (Father) questioned her about how a perpetrator is "confirmed." She responded that "there's an interview that has to be done. And then [the Petitioner–Appellee Department of Human Services (DHS or the DHS)] validate[s] [the abuse] based on what the child or person says, and the details of it, and their [sic] recall, especially specific

details[,] like what clothing they [sic] were wearing, what happened."

8. Dr. James Bidwell described a culdoscope as "an instrument that has a camera and a magnifying apparatus [attached] to it that allows . . . doctor[s] or nurses doing an evaluation to get a very close-up view of whatever area [they are] looking at. In the case of sexual assault, it's usually the genital area or the anal area."

Burke admitted that she did not interview the children, but explained that she had spoken with Mother and had reviewed records and reports of discussions with the children. She reiterated that "sex offender treatment [would] be a prerequisite to [Father's] participation in the family reunification process[.]" Burke opined that Child I was at "substantial" risk of harm from Father.

In forming her opinion, Burke relied on "one of the primary studies in the field" that suggested "incest offenders, if the primary target is removed, would—could and do offend [sic] another child in the home." Burke conceded that there was no physical evidence of sexual abuse of Child II.

During cross-examination, Father's counsel sought to question Burke about "civil[ and ]criminal coordination meetings" which Burke defined as "meetings that are generally facilitated through [CAC] ... to coordinate services between [the DHS], [p]robation [d]epartment, and the [p]olice [d]epartment." The court sustained an objection to the question, determining that "any civil[ or ]criminal investigation [was] beyond the scope of th[e] hearing."

At the end of Burke's testimony, Father's counsel moved for dismissal on the basis that DHS had "fail[ed] to provide any witnesses that sustained the Dalberg [sic] test" and thus failed to present any "competent evidence by any expert that [Father was] a threat to his natural daughter."

The court denied the motion.

## G.

Father did not testify at the trial.

The guardian presented arguments on motions made during the adjudicatory hearing. He also cross-examined several of the witnesses. The record does not reflect that the guardian made to the court any final recommendation concerning the children.

## II.

On January 2, 1998, Father filed a motion to dismiss for breach of the confidentiality of the proceedings and for discovery abuses. His motion claimed there was a "systematic sharing of information with the prosecutors, and police, after the [p]etition was filed herein[, and that the DHS] withheld key forensic reports related to the examination of [Child I] which were exculpatory in nature."

DHS submitted an opposition memorandum conceding that "proceedings under the Child Protective Act are confidential," but insisting that "the joint [sic] meeting[s] between the DHS, the police, the prosecutor, and the child's therapist" were authorized by HRS §§ 588–1 (1993) and –4 (1993). The DHS also proffered that Father had been notified of Child I's forensic medical examination, but that he did not "follow up" on that information.

On June 20, 1998, the court denied Father's motion, declaring that "HRS [§ ] 350–1.4 [ (1993) ] gives the director of the [DHS] the authority to adopt rules relating to confidentiality ... [and Hawai'i Administrative Rules (HAR) ] Rule 17–920.1–8 ..., [w]hen read in conjunction with HRS [§ ] 587–21 [ (1993),[9] ] ... [permits] the police, the prosecutor, the victim/witness counselor, the child's therapist and the children's [guardian] ... to receive confidential information from the [DHS]...." No ruling was made on the purported exculpatory evidence.

## III.

On January 21, 1998, the court issued its findings, conclusions, and order sustaining the petition for supervision.

On January 29, 1998, Father submitted a motion for reconsideration.

On May 13, 1998, the court granted the motion for reconsideration, and issued its amended findings, conclusions, and order.

---

9. HRS § 587–21 (1993), entitled "Investigation," states, in relevant part that "[u]pon receiving a report that a child is subject to imminent harm, has been harmed, or is subject to threatened harm," the DHS may "[e]nlist the cooperation of appropriate law enforcement authorities for phases of the investigation ... and the law enforcement authority may conduct and provide the [DHS] the results of a criminal history record check concerning an alleged perpetrator of imminent harm, harm, or threatened harm to a child...."

The following findings are relevant to this appeal:

33. As testified by [Burke] ... once the primary target of the abuse is removed, offenders often offend against other children. In the instant case, [Child II] is no longer accessible to [Father]. It is foreseeable that he will use another child, even his own daughter, to fulfill his needs;

. . . .

35. [Reinhart] and [Burke] are both experts in child protective services under [HRS] chapter 587 and have had many years of experience in the field. It is their expert opinion that [f]amily [c]ourt jurisdiction over [Father] and [Child I] is needed to protect [Child I] from harm;

. . . .

38. The position of the [guardian] supported the establishment of [f]amily [c]ourt jurisdiction over [Father] and [Child I] under the Child Protective Act by [the guardian's] participation and inquiry during the adjudication hearing[.]

### IV.

On appeal, Father argues that the court erred in considering Child I's petition because it was not verified.[10] According to Father, "[t]he verification requirement is mandatory" but the "[p]etition ... [was] not made upon a sworn statement of [Reinhart], and thus [did] not comply with the requirements [of the statute]."

HRS § 587–31, entitled "Petition," states, in relevant part:

(a) A petition invoking the jurisdiction of the court under this chapter shall be filed in the manner provided in this section:

(1) Petitions shall be entitled "In the Interest of _____, born on _____," and *shall be verified* . . . .

(Emphasis added.) HRS § 587–31 does not require the verification to be sworn before an officer authorized to administer oaths.

10. While Father makes this argument with respect to both petitions, we recognize that only

### A.

■ "To 'verify' [includes] ... to confirm or establish the truth or truthfulness of; to confirm or establish the authenticity of; to authenticate....'" *Amfac v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 109, 839 P.2d 10, 24, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (quoting *Black's Law Dictionary* 1561 (6th ed.1990) (some citations omitted)). We interpret the requirement that the petition be "verified" as meaning that the petition must contain a confirmation as to the truthfulness or authenticity of its contents.

■ As previously set forth, Reinhart vouched in the petition that its contents were "true and correct" based on her "knowledge, information and belief." We regard this declaration under jeopardy of perjury, a confirmation of the truthfulness of the petition. It was thus sufficient to satisfy the verification requirement of HRS § 587–31.

### B.

■ Further, we recognize that any deficiency in the verification required under HRS § 587–31 would not pose an impediment to the court's jurisdiction. In *In re Doe*, 84 Hawaiʻi 41, 50–51, 928 P.2d 883, 892–93 (1996), the appellant argued that under HRS § 587–31, the filing of a petition was a statutorily-mandated prerequisite to child protective proceedings. The supreme court identified three "basic purposes" for requiring a petition: (1) "to gather for the court information ..."; (2) "to provide for the inclusion in the petition of notice to a minor's family of possible termination of parental and custodial rights and duties ..."; and (3) "to provide for family court review of the information contained in the petition...." *Id.* at 51, 928 P.2d at 893 (footnote omitted). In light of these purposes, the supreme court decided that "constru[ing] the petition requirement in HRS § 587–31 as mandatory would significantly restrict the flexibility of the family court to respond appropriately to the varied circumstances of domestic situations." *Id.*

Child I's petition is relevant to the issues on appeal.

In our view, the same reasoning applies to the verification requirement in HRS § 587–31. Thus, even if Reinhart's verification were somehow deficient, we conclude the court was not precluded from responding to it in this child protective proceeding.

## V.

### A.

Father also maintains that the case should be remanded because the guardian failed to make the reports and recommendations required of him under HRS § 587–34.

HRS § 587–34(c) provides that

[a] guardian ad litem appointed pursuant to subsection (a) *shall report to the court and all parties in writing at six month intervals, or as otherwise ordered by the court, regarding such guardian ad litem's activities on behalf of the child and recommendations concerning the manner in which the court should proceed in the best interests of the child;* provided that such guardian ad litem shall make face to face contact with the child in the child's family or foster home at least once every three months. A guardian ad litem shall inform the court of the child's perceived interests if they differ from those being advocated by the child's guardian ad litem. If the child and the child's guardian ad litem are not in agreement, the court shall evaluate the necessity for appointing special counsel for the child to serve as the child's legal advocate concerning such issues and during such proceedings as the court deems to be in the best interests of the child.

(Emphases added.) " '[W]here the language of a statute … is plain and unambiguous, construction by [the] court is inappropriate and [the court's] duty is only to give effect to the law according to its plain and obvious meaning.' " *Honbo v. Hawaiian Ins. & Guar. Co.,* 86 Hawai'i 373, 377, 949 P.2d 213, 217 (App.1997), *cert. denied,* 88 Hawai'i 370, 966 P.2d 1096 (1998) (quoting *Strouss v. Simmons,* 66 Haw. 32, 50, 657 P.2d 1004, 1016

(1982)) (brackets in original). We conclude then that on its face, HRS § 587–34 mandates the guardian to submit written reports and recommendations to the court concerning the best interests of the child.

The guardian was appointed on January 9, 1997. The adjudicatory hearing on Child I's case began on September 24, 1997. However, the guardian apparently did not submit any reports in the interim, or submit any written recommendation as to how the court "should proceed in the best interests of the child." HRS § 578–34. Nevertheless, we do not believe that any error in this regard requires the case to be remanded.

While reports and a recommendation from the guardian were called for, they would not have been determinative.[11] The court was provided with the home report and testimony from several witnesses bearing upon the threatened harm to Child I. The evidence amply supported the court's determination that family supervision was appropriate.

### B.'

As to Finding 38, Father contends that the court erred in finding that "[t]he position of [the guardian] supported the establishment of [f]amily [c]ourt jurisdiction over [Father.]" Findings of fact are reviewed under the clearly erroneous standard. *Hirono v. Peabody,* 81 Hawai'i 230, 232, 915 P.2d 704, 706 (1996) (citation omitted). As set forth above, the guardian cross-examined several witnesses. He also advocated the DHS's position during arguments on motions. While the guardian apparently failed to make recommendations on the petition's disposition, we believe it can be inferred from the record that he was in agreement with the DHS's position. Thus, there was substantial evidence to support this finding.

## VI.

Father professes that he was prejudiced by the denial of his oral motion for severance of the cases because "he was not a

---

11. There may be circumstances in which a report from a guardian ad litem may be material in determining whether a petition should be sustained. The statutory requirements of HRS § 587–34 should be followed by the guardian ad litem and enforced by the court in every instance.

real party [in interest in Child II's] case[,]" "evidence and testimony of [Child II's] treatment and counseling should never have been revealed to a non-party to the action[,]" and "records relating to [Child II] would [have been] inadmissible in the case involving [Child I.]"

We perceive that the court did not order consolidation of the cases pursuant to any particular rule. However, since the cases were child protective proceedings, the Hawai'i Family Court Rules (HFCR) would ostensibly govern. In that connection, HFCR Rule 42 states, "The court may order actions between the same parties consolidated for hearing; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

Here, consolidation did not involve the same parties. The case concerning Child II involved Mother, Child II's natural father, and the DHS. The case concerning Child I involved Mother, Father, and the DHS. Aside from HFCR Rule 42, however, we believe the court was authorized to order consolidation in this instance because it had inherent power to control litigation pending before it:

> [C]ourts have inherent equity, supervisory, and administrative powers as well as inherent power to control the litigation process before them. Inherent powers of the court are derived from the state [c]onstitution and are not confined by or dependent on statute. Among courts' inherent powers are the powers to create a remedy for a wrong even in the absence of specific statutory remedies and to prevent unfair results.

*Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 507–08, 880 P.2d 169, 182–83 (1994) (internal quotation marks, citations, and brackets omitted) (emphasis added). The exercise of such power is reviewed for an abuse of discretion. *Id.* In ordering consolidation, the court was obligated to balance the interest in judicial efficiency obtained by consolidation, against the risk of prejudice to the non-moving party. *Cf. In re John Doe,* 79 Hawai'i 265, 274, 900 P.2d 1332, 1341

(App.1995) (holding that "[t]he court must take into account whether consolidation would promote the economical and efficient administration of criminal justice ... and would protect criminal defendants from unfair prejudice that may be caused by the joining of cases" (internal quotation marks, citation, and brackets omitted)). Thus, subject to review for abuse, we conclude the court had the inherent power to consolidate cases even where the parties were not the "same." It follows that if the court had the inherent power to consolidate cases, then it had the inherent power to sever cases, subject to review for abuse.

Father's first claim that he was not a "real party" to Child II's case is moot in light of his failure to object to consolidation.

Father's second claim that Child II's treatment and counseling should not have been revealed to him does not evince any prejudice flowing to him.

■ Father's third claim that prejudice resulted from the admission of Child II's records in the consolidated hearing would be persuasive if such evidence would not have been admissible in a separate hearing concerning Child I. However, evidence of Child II's abuse would be relevant and directly related to the allegations of threatened harm to Child I. Consequently, even if the cases had been severed, evidence of Child II's abuse would have been admissible in Child I's case. Thus, the court did not abuse its discretion in denying Father's motion to sever.

### VII.

Father further claims that Reinhart's and Burke's testimonies did not comply with the requirements for expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[12]

### A.

■ Reinhart and Burke came under the purview of HRS § 587–40(d), which provides

---

12. It appears that Father only challenges Reinhart's and Leslie Burke's qualifications as experts. Father does not assert that Roxy Mico was improperly qualified as an expert witness.

that any "person employed by [the DHS] as a social worker in the area of child protective or child welfare services *is qualified to testify as an expert* in the area of social work and child protective or child welfare services." (Emphasis added.) However, " '[w]hether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion.' " *State v. Fukusaku*, 85 Hawai'i 462, 472, 946 P.2d 32, 42, *reconsideration denied*, 85 Hawai'i 462, 946 P.2d 32 (1997) (quoting *State v. Maelega*, 80 Hawai'i 172, 180, 907 P.2d 758, 766 (1995)).

## B.

 Contrary to Father's protestations, it is not settled that the *Daubert* test has been adopted in Hawai'i.[13] The *Daubert* test consists of four factors that "influence the liability inquiry: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error; and (4) wide-spread acceptance in the relevant scientific community." *Fukusaku*, 85 Hawai'i at 472 n. 5, 946 P.2d at 42 n. 5 (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786). However-

er, it is well-settled that the Hawai'i Supreme Court "has followed a two-pronged analysis when addressing proposed expert testimony." *Fukusaku*, 85 Hawai'i at 472–73, 946 P.2d at 42–43 (citations omitted). In *Fukusaku*, the supreme court said:

> The critical inquiry with respect to expert testimony . . . is whether such testimony "will *assist the trier of fact to understand the evidence or determine a fact in issue.* . . ." [HRE Rule 702[14]] Generally, in order to so assist the jury an expert must base his [or her] testimony upon a sound factual foundation; *any inferences or opinions must be the product of an explicable and reliable system of analysis;* and such opinions must add to the common understanding of the jury. *See* [HRE Rule 703[15]].

*Id.* at 473, 946 P.2d at 43 (quoting *Maelega*, 80 Hawai'i at 181, 907 P.2d at 767) (some internal quotation marks and citations omitted; some brackets, some emphases, and footnotes added; some emphases in original); *see also State v. Montalbo*, 73 Haw. 130, 828 P.2d 1274 (1992); *State v. Kim*, 64 Haw. 598, 645 P.2d 1330 (1982). "In short, expert testimony must be (1) relevant and (2) reliable."[16]

---

13. This court recently stated that

> [i]t is not clear from a reading of [*State v.*] *Fukusaku*[, 85 Hawai'i 462, 946 P.2d 32, reconsideration denied, 85 Hawai'i 462, 946 P.2d 32 (1997)] . . . whether the supreme court was adopting the Daubert standards for analyzing the admissibility of scientific evidence.

*State v. Ito*, 90 Hawai'i 225, 236 n. 7, 978 P.2d 191, 202 n. 7 (App.1999).

14. Hawai'i Rules of Evidence (HRE) Rule 702, entitled "Testimony by experts," provides:

> If scientific, technical, or *other specialized knowledge will assist the trier of fact* to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.
> (Emphasis added.)

15. HRE Rule 703, entitled "Bases of opinion testimony by experts," provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

16. *Fukusaku*, 85 Hawai'i at 472, 946 P.2d at 42, said that "in *Daubert*, the [United States Supreme] Court noted that [Federal Rules of Evidence (FRE)] Rule 702 applies to 'scientific, technical, or other specialized knowledge . . . [although the United States Supreme Court] was careful to limit its holding in *Daubert* to 'scientific knowledge.' " (Citation omitted.)
*Fukusaku* distinguished "scientific knowledge" from "technical knowledge," indicating that the reliability of technical knowledge could be inferred from proven underlying scientific principles and procedures:

> "Scientific knowledge" must be distinguished from "technical knowledge." Expert testimony deals with "scientific knowledge" when it involves the validity of the scientific principles and the reliability of the scientific

*Fukusaku,* 85 Hawai'i at 473, 946 P.2d at 43 (citing *State v. Samonte,* 83 Hawai'i 507, 533, 928 P.2d 1, 27 (1996); *Maelega,* 80 Hawai'i at 181, 907 P.2d at 767).

Father does not take issue with the relevancy of Reinhart's and Burke's testimonies. He argues that their testimonies were unreliable. His core contention is that "there is no scientific evidence based on empirical research to conclude that there is [a] high recidivism rate for child sex abusers who have not been treated," as testified to by Reinhart and Burke.

■■■■ We note that "[s]pecialized knowledge which is the proper subject of expert testimony is knowledge not possessed by the average trier of fact who lacks the expert's skill, experience, training, or education." *State v. Batangan,* 71 Haw. 552, 556, 799 P.2d at 51 (citation omitted). Reinhart's and Burke's testimonies were akin to expert testimony on domestic violence. Such expert testimony has been characterized by the supreme court as being in the realm of "specialized knowledge." *Maelega,* 80 Hawai'i at 183, 907 P.2d at 769. *See also State v. Clark,* 83 Hawai'i 289, 298–99, 926 P.2d 194, 203–04, *reconsideration denied,* 83 Hawai'i 545, 928 P.2d 39 (1996). " '[S]pecialized knowledge' may be deemed reliable even if it is not empirically testable." *Fukusaku,* 85 Hawai'i at 473, 946 P.2d at 43. However, "under HRE Rule[s] 702 and 703, a trial court may disallow expert testimony if it concludes that the proffer of specialized knowledge is based on a mode of analysis that lacks truthworthiness." *Maelega,* 80 Hawai'i at 182, 907 P.2d at 768 (emphasis omitted).

*State v. Rinehart,* 8 Haw.App. 638, 819 P.2d 1122, *cert. denied,* 72 Haw. 619, 841 P.2d 1075 (1991) is persuasive in this regard. In *Rinehart,* the appellant had been charged with sexual assault in the first degree for assaulting his four-year-old daughter. On appeal, he challenged the expert testimony of the Child Protective Service witness, contending that the "showing was inadequate" to create the inference that [the witness's] opinions were reliable. *Id.* at 645, 819 P.2d at 1126.

During her voir dire, the witness testified she had had "500 or so hours . . . of training . . . [in] how to investigate complaints of child abuse or neglect, interviewing techniques, [and] behaviors to look for in children who have been abused or neglected. . . ." *Id.* She further declared that her opinion was based "on characteristics [and] behaviors of the child . . . plus interviewing the child." *Id.* at 644, 819 P.2d at 1125–26. This court concluded that the trial court did not abuse its discretion in admitting the witness's opinions because her "testimony create[d] a reasonable inference that [the] opinions were based

procedures themselves. In contrast, expert testimony deals with "technical knowledge" when it involves the mere technical application of well-established scientific principles and procedures. In such a situation, because the underlying scientific principles and procedures are of proven validity/reliability, it is unnecessary to subject technical knowledge to the same type of full-scale reliability determination required for scientific knowledge. Thus, although technical knowledge, like all expert testimony, must be relevant and reliable, its reliability may be presumed.

*Id.* at 473, 946 P.2d at 43.

"We note . . . that in *Kumho Tire Co. v. Carmichael,* [—— U.S. ——, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)], the United States Supreme Court held that the standards for analyzing scientific evidence articulated in *Daubert* . . . apply equally to technical evidence." *Ito,* at 236 n. 7, 978 P.2d at 202 n. 7.

In *Kumho,* the United States Supreme Court decided "it would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge. There is no clear line that divides the one from the others." —— U.S. at ——, 119 S.Ct at 1174. As a result, it held that

Daubert's general principles apply to the expert matters described in [FRE] Rule 702. . . . And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a "reliable basis in the knowledge and experience of [the relevant] discipline."

*Id.* at ——, 119 S.Ct. at 1175 (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786).

Thus, while our supreme court has distinguished scientific knowledge from technical knowledge when considering the admissibility of expert testimony, the federal courts no longer recognize such a distinction. It is not evident that Hawai'i has in fact adopted the standards for admission of expert evidence set forth in *Daubert* and as modified in *Kumho.*

upon an explicable and reliable system of analysis." *Id.* at 645, 819 P.2d at 1126.

 Similarly, here, the court found that "[Reinhart] and [Burke] are both experts in child protective services under [HRS] chapter 587 and have had many years of experience in the field." Reinhart and Burke testified to their extensive experience in working with abused children. Reinhart confirmed that her opinions were "[b]ased on [her] experience of ... thirteen years ... [a]nd for the last five years strictly doing sex abuse[,] ... [and her protocol [17] training and experience." Reinhart recounted that she had interviewed between 800 and 1000 child abuse victims, and had conducted between twenty-five and thirty interviews of sex abuse victims. She based her opinions on research, training, and experience. Burke testified to receiving over 200 hours of training in child sex abuse matters. Her opinion was based on studies conducted on child abuse, including a "primary study" in that field.

Reinhart and Burke knew of the psychological and medical examinations Child II had undergone. Reinhart interviewed Child II, and testified to Child II's descriptions of the sexual abuse she suffered. While Burke did not personally conduct interviews of the children, she had spoken with Mother about the case and was familiar with all of the reports prepared about the children. Based on their experience with sexually abused children and their offenders, Reinhart and Burke postulated that Father posed a substantial threat to Child I. From the foregoing, as in *Rinehart*, there is a reasonable basis to infer that both Reinhart's and Burke's opinions were "based upon an explicable and reliable system of analysis." 8 Haw.App. at 645, 819 P.2d at 1126. Under these circumstances, we cannot conclude there was a "clear abuse of discretion" by the court in admitting the testimony of these witnesses. *Fukusaku*, 85 Hawai'i at 472, 946 P.2d at 42.

## VIII.

Father urges that neither harm nor threatened harm to Child I was properly alleged or proven.

### A.

██ HRS § 587–11 permits the court to exercise jurisdiction where a child's "physical or psychological health or welfare ... is subject to threatened harm." "Threatened harm" is defined as "any reasonably foreseeable substantial risk of harm to a child with due consideration being given to the age of the child and to the safe family home guidelines, as set forth in section 587–25." HRS § 587–2. Thus, allegations of actual harm are not required to sustain a petition for family supervision and allegations of threatened harm would suffice.

As indicated previously, the petition contained Child II's disclosure of sexual harm by Father. Child I's petition disclosed that "[Child I] had an unauthorized [and] unsupervised visit with Father." Certainly, Child I's petition could have been more descriptively worded in linking the threat posed for Child I as a result of the allegations concerning Child II. But in the context of the request for family supervision, the disclosure of sexual harm to Child II, and the reference to Father's unauthorized, unsupervised visit with Child I, Father could reasonably infer from the petition that threatened harm was the basis for assertion of family court jurisdiction.

Furthermore, Father fails to point to any prejudice to him. The home report was served on Father along with the petition on January 2, 1997. The report and the petition contained the details of the threatened harm to Child I. As a result, Father had ample notice of the purported harm to Child I.

### B.

Father also argues that threatened harm was not proven through the testimony of Reinhart and Burke because such testimony was erroneously admitted. We have already

---

**17.** "Protocol" is defined as a "plan of scientific or medical experiment or treatment[.]" *Web-* *ster's New Int'l Dictionary* 1824 (6th ed.1981).

concluded that the testimony was properly admitted.

Relatedly, Father asserts that Mico did not render an opinion as to threatened harm. According to Father, Mico's testimony "only" concerned "service plans" and "the effect of failing to obtain treatment." As set forth *supra*, however, Mico did testify that when once a child has been sexually abused, and the abuser has not undergone treatment, the risk of harm to the other child would be "fairly high." Mico's opinions as to the general behavior of sexual offenders were thus relevant to whether Child I was at risk for harm.

### IX.

According to Father, the court erred in denying his motion for dismissal because under HFCR Rule 79, certain family court records are deemed confidential. In that connection, Father maintains that there was no "authority" to conduct task force meetings in which the DHS and the police apparently shared information about this case.

HFCR Rule 79 states:

Pursuant to [HRS §§ ] 334–5, 571–84 and 578–15, and by order of the court pursuant to sections 92–50 and 92–51, certain records and documents are confidential. *Unless otherwise provided by [the HRS]*, all requests for information contained in a confidential record shall be made in writing and shall include the reason for the request and how the information is to be used.[18]

(Emphasis added.) As evident under HFCR Rule 79, the records are designated as confidential "unless otherwise provided by [the HRS.]" The DHS points out that HRS

§ 350–1.4 permits it to adopt administrative rules for "authorized disclosure" of such information:

**Confidentiality.** (a) All reports to the department concerning child abuse or neglect made pursuant to this chapter, as well as all records of such reports, are confidential. The director may adopt rules, pursuant to [HRS] chapter 91, to provide for the confidentiality of reports and records and for the authorized disclosure of reports and records.[19]

In that regard, the DHS is allowed to release confidential information to, *inter alia*, "[p]roperly constituted authorities or agencies both military and civilian, investigating a report of known or suspected child abuse or neglect, or providing services to a child or family who is the subject of a report[.]" HAR Rule 17–920.1–8(c).

DHS additionally maintains and Father does not dispute, that the subject meetings were held pursuant to HRS chapter 588 (1993), which established the Children's Advocacy Program. One of the objectives of that Program is to "[d]evelop, achieve, and maintain interagency and interprofessional cooperation and coordination in the case management of intrafamilial and extrafamilial child sex abuse cases[.]" HRS § 588–1. Under HRS § 588–4, the director of the program is authorized to "[c]oordinate the flow of information between the agencies responsible for criminal prosecution and those agencies responsible for protective action in civil proceedings[.]" In light of the foregoing provisions in the HRS and in the absence of any particularized objection to these statutes by Father, we cannot conclude that the court erred in denying Father's motion to dismiss.[20]

---

18. While Hawai'i Family Court Rule 79 refers to certain statutes, Father fails to set out those statutes or to designate the specific statutory language applicable to his argument.

19. HRS § 350–2(b) (1993) also expressly authorizes disclosure upon a specific law enforcement request:

The [DHS] shall inform the appropriate police department or office of the prosecuting attorney of the relevant information concerning a case of child abuse or neglect when such information *is required by the police department or*

the office of the prosecuting attorney for the investigation or prosecution of that case[.]

There is no indication in the record that such a request was made here.

20. Father argues on appeal that the creation of the civil and/or criminal task force "affected" his "civil, criminal, and due process rights." He fails to make any discernible argument as to how his rights in these areas were affected. Thus, we need not address this issue. *See Loui v. Board of Medical Examiners*, 78 Hawai'i 21, 29 n. 19, 889 P.2d 705, 713 n. 19 (1995).

## X.

■ Lastly, Father asserts that the court incorrectly rejected his claim that DHS's failure to "provide [him] with the SANE exam findings that disclosed no evidence of sexual abuse [of Child I]" warranted dismissal. In his motion to dismiss for discovery abuses, Father argued that "[the DHS] withheld key forensic reports related to the examination of [Child I] which were exculpatory in nature." According to DHS's opposition memorandum to this motion, the DHS notified Father that Child I had undergone a forensic medical examination; however, Father never requested the results from that examination.

As the DHS emphasizes, there was never any contention that Child I had been abused, only that she was at risk of being so. The supposed exam findings, hence, would not be exculpatory of allegations of *threatened* harm. Accordingly, the court did not err.

## XI.

For the foregoing reasons, we affirm the May 13, 1998 amended findings, conclusions, and order sustaining the DHS's petition for family supervision of Father and Child I.

We point out, however, that our conclusion is limited to the instant case and is not intended to affect any collateral or other proceedings which have been or may be subsequently brought against Father concerning the same or similar facts.